IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SANITEC INDUSTRIES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-3066 |
| | § | |
| MICRO-WASTE CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**<u>FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND CONCLUSION AND ORDER</u>**

**Table of Contents**

**Title**                                                                      **Page**

**Findings of Fact:**

   I.     The Parties . . . . . . . . . . . . . . . . . . . .   1

  II.     The Relevant Sanitec Entities . . . . . . . . . .   2

 III.    The Efficacy of the Patent Application
         Process Under the Patent Cooperation Treaty,
         Issuance of the '000 Patent, and Whether
         There was Inequitable Conduct . . . . . . . . . . .   3

 IV.    Whether the Patent is Invalid Due to Anticipation .  15

          A.   Comparison of "Heating Means" Limitation in
               Claim 1 (*see* Conclusions of Law Nos. 79-92)
               with Alleged Prior Printed Publications . . .  23

          B.   Comparison of the Eight Steps of the Process
               Claim 18 (*see* Conclusions of Law Nos. 93-122)
               with Alleged Prior Printed Publications . . .  26

  V.     The Trademarks . . . . . . . . . . . . . . . . . .  26

 VI.    The Facts Regarding (i) Alleged Conversion by
         Micro-Waste, (ii) Alleged Patent Infringement by
         Micro-Waste, (iii) Alleged Lanham Act and Unfair
         Competition by Micro-Waste, (iv) Alleged
         Fraudulent Inducement of the License Agreement by
         Micro-Waste, (v) Alleged Breach of the License
         Agreement by Industries, and (vi) Alleged Damages
         Sustained by Micro-Waste from Industries's Breach
         of the License Agreement . . . . . . . . . . . . .  27

 VII.    Group's Agreements with Platinum Funding . . . . .  51

**Conclusions of Law:**

   I.     Patent Applications Under the Patent
         Cooperation Treaty . . . . . . . . . . . . . . . .  54

i

II.     Proof Required to Show Patent Invalidity . . . . .   58

        A.    Requirements to Show Invalidity due to
              Anticipation:  35 U.S.C. § 102(b) . . . . . .   59

        B.    The "On Sale" Bar . . . . . . . . . . . . .   63

        C.    The Prior Printed Publications Bar . . . . . .   67

        D.    Construction of Claims 1 and 18 for
              Comparison Purposes on Anticipation . . . . .   70

III.    Patent Unenforceability: Inequitable Conduct . . .   84

IV.     The Requirements for Fraudulent Inducement . . . .   86

V.      License as an Affirmative Defense to the
        Patent Infringement Claim . . . . . . . . . . . .   89

VI.     Breach of the License Agreement Contract
        by Licensor Industries . . . . . . . . . . . . .   89

VII.    Conversion . . . . . . . . . . . . . . . . . . .   93

VIII.   Lanham Act/Unfair Competition . . . . . . . . . .   95

**Conclusion and Order** . . . . . . . . . . . . . . . . . .   97

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SANITEC INDUSTRIES,                §
                                   §
      Plaintiff,                   §
                                   §
v.                                 §        CIVIL ACTION NO. H-04-3066
                                   §
MICRO-WASTE CORPORATION,           §
                                   §
      Defendant.                   §

**FINDINGS OF FACT, CONCLUSIONS OF LAW,**
**AND CONCLUSION AND ORDER**

After all parties have rested and closed the evidence, and having heard and considered the arguments and authorities of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, followed by the Court's Conclusion and Order.

**Findings of Fact**

**Except where the clear and convincing evidence standard of proof applies and the Court so notes, the Court finds from a preponderance of evidence as follows:**

I.    The Parties

1.    Plaintiff/Counterclaim Defendant Sanitec Industries, Inc. ("Industries") is a corporation organized under the laws of the

1

State of California, having its principal place of business in California.  Industries was incorporated on February 19, 2003.

2.  James Harkess ("Harkess") is the President and CEO of Industries.

3.  Defendant/Counterclaim Plaintiff Micro-Waste Corporation ("Micro-Waste") is a corporation organized under the laws of the State of Texas, having its principal place of business in Fort Worth, Texas.  Micro-Waste was founded in September 1989 and was incorporated in February 1990.

4.  Robert Bollinger ("Bollinger") is the President of Micro-Waste.

II.  The Relevant Sanitec Entities

5.  At least in the 1980's Vetco Sanitec GmbH ("Vetco Sanitec") was a German subsidiary of Combustion Engineering ("CE").

6.  During that period of time CE-Environmental, Inc. ("CE-E") and CE Impell ("CE-I") were also subsidiaries of CE.

7.  In December 1989, Asea Brown Boveri Inc. ("ABB") purchased CE.  The two companies merged in January 1990.

8.  Shortly thereafter, CE-E became ABB Environmental Services, Inc. ("ABB-E"), and CE-I became ABB Impell ("ABB-I").

9.  John Cusack ("Cusack") and Joseph Delloiacovo ("Delloiacovo") were both employees of CE-E.

10.  In 1990, ABB formed ABB-Sanitec, Inc. ("ABB-S").

2

11.  Cusack served as President of ABB-S from its inception in 1990 until 1993.

12.  In 1995, ABB-S became Sanitec, Inc. ("Inc.").

13.  In April 2001, Sanitec, Inc. became Sanitec, Ltd. ("Ltd.").

14.  On February 20, 2002, Sanitec Group, LLC ("Group") was formed.

15.  Group was owned by Guardian Investments, LLC ("Guardian"), which was in turn owned by Steven Ventre ("Ventre").

16.  Guardian is an Ohio limited liability company organized on or about October 1, 1999.

17.  Ventre was the sole Member of Guardian and Group.

18.  Group was managed by Delloiacovo as President until his resignation in February 2004.

19.  In February 2004, Group assigned its assets to Industries.

III.  <u>The Efficacy of the Patent Application Process Under the Patent Cooperation Treaty, Issuance of the '000 Patent, and Whether There was Inequitable Conduct</u>

20.  The patent-in-suit is U.S. Patent No. 5,270,000 ("the '000 Patent"), entitled "Apparatus and Process for Treating Medical Hazardous Wastes."  The technology covered by the '000 Patent (the "Sanitec Technology") pertains to a device, often called a "microwave disinfection unit" or "MDU," and process that uses

3

microwaves to disinfect and sterilize medical waste in an economical and environmentally friendly manner.

21.  The Sanitec Technology was originally developed by employees of Vetco Sanitec.

22.  The named inventors of the '000 Patent, Helmut Goldner, Reinhold Kamann, and Heinz Leinski ("Leinski") (collectively, the "Inventors") were located in Germany.

23.  On April 19, 1989, a Federal Republic of Germany patent application, Serial No. P3912751.6 (also called DE 39 12 751) (the "German Application"), was filed with the German Patent office and issued as German Patent No. 3912751 (the "German Patent").

24.  The German Patent discloses the Sanitec Technology and is a foreign counterpart of the '000 Patent.  Industries is the current owner of the German Patent.

25.  On April 16, 1990, international application No. PCT/US90/02043 (the "PCT Application") was filed under the Patent Cooperation Treaty (the "PCT").

26.  The Patent Application designated Canada, Japan, and the United States for national patent protection.

27.  The PCT Application listed Vetco Sanitec as the applicant for Japan, ABB-E as the applicant for Canada, and the Inventors as the applicants for the United States (collectively, the "Applicants").

4

28.   The PCT Application included a 19-page description, 4 pages of claims, a 1-page abstract, and 7 pages of drawings.

29.   The PCT Application claimed priority based on the April 19, 1989, German Application, and a certified copy of the German Application accompanied the PCT Application.

30.   The PCT Application was also accompanied by a request to charge fees to a deposit account, and the fee calculation worksheet provided that the European Patent Office ("EPO") would conduct the international search.

31.   The fee calculation worksheet also provided that the designation fees were to be applied first to the United States, and then to Japan and Canada, in that order, indicating that the Applicants viewed patent protection in the United States being of highest importance.

32.   On May 15, 1990, the EPO notified the Applicants' attorney, Richard Berneike ("Berneike"), that the search copy of the PCT application had been received by the EPO on May 9, 1990.

33.   The PCT Application was published with an international search report on November 1, 1990, under PCT Publication No. W090/12602.

34.   On September 27, 1991, the United States Patent and Trademark Office ("USPTO") received a transmittal letter from the Applicants' attorney Berneike, requesting that the PCT Application be entered into the national stage in the United States.

35.  In the September 27, 1991 transmittal letter, Berneike stated that the request to enter the national stage was being made "by 30 months and a proper demand for International Preliminary Examination [a "Demand"] was made by the 19th month from the earliest claimed priority date."

36.  The evidence is not clear and convincing that Berneike's representation that a proper Demand had been filed within 19 months after April 19, 1989, priority date was either mistaken or false.

37.  A proper Demand for International Preliminary Examination was timely filed within 19 months after April 19, 1989.

38.  After processing, the PCT Application was assigned United States application Serial No. 07/768,870 (the "'870 Application").

39.  On October 22, 1991, the USPTO drafted from the deposit account the national stage application fee for the '870 Application.

40.  On October 25, 1991, the USPTO mailed to Berneike a "Missing Requirements under 35 U.S.C. § 371 and 37 CFR 1.494 or 1.495" notification, which stated:

> The following items must be received by ☒ 22 ☐ 32 months from any claimed priority date for the application to be accepted for examination:
>
> . . .
>
> ☒ Oath or declaration of the applicant(s) for DO/EO/US
>
> ☒ Surcharge for providing the fee and/or oath or declaration later than ☐ 20 ☐ 30 months from any claimed priority date (37 CFR 1.492(e)) $120

6

41.   The "22" months box, rather than the "32" months box, was mistakenly checked on the foregoing Missing Requirements form, an obvious mistake since a Demand had been filed (*see supra* Findings of Fact Nos. 35, 36, and 37), which entitled the Applicant to 30 months (plus two months grace period) within which to enter the national stage.

42.   In fact, the Missing Requirements form was not mailed until October 25, 1991, which itself was more than 22 months after the April 19, 1989, priority date.   Thus, when the Missing Requirements form was mailed, there was no possibility that the applicants could submit their oath or declaration within 22 months from the priority date.   This further evidenced the mistaken marking of the box designating "22" months.

43.   The purpose of the Missing Requirements form is to provide the applicant(s) with an opportunity to satisfy the requirements of 35 U.S.C. § 371(c).

44.   If no Demand had been made and 20 months (plus two months grace period) from April 19, 1989, had actually been the time allowed to enter the national stage, then by October 25, 1991 (30+ months after the priority date), the USPTO instead of sending a Missing Requirements form would have, if anything, given notice that the PCT Application had been abandoned as to the United States.

7

45.   The fact that the USPTO sent a Missing Requirements notification as late as October 25, 1991, evidences that the USPTO was actually processing the '870 Application under Chapter II of the PCT, and that under 37 C.F.R. 1.495(c) the Applicants therefore had 32 months after the April 19, 1989, priority date within which to file the declaration.

46.   On October 31, 1991, Berneike responded to the Missing Requirements notification by submitting three copies of the 35 U.S.C. § 371(c)(4) Declaration and authorizing the USPTO to draft the surcharge from the deposit account.

47.   Because the Declaration was filed within 32 months of the April 19, 1989, priority date--_i.e._, before December 19, 1991--the Declaration was timely filed.

48.   Because October 31, 1991 is the date on which the Applicants fully satisfied the last of the 35 U.S.C. § 371(c) requirements, October 31, 1991, is displayed as the "371(c) Date," the "102(e) Date," and the filing date on the file wrapper.

49.   Although the file wrapper lists the "Filing Date" of the '000 Patent as October 31, 1991, this is merely the date of receipt of all 35 U.S.C. § 371(c) requirements, not the actual international filing date.

50.   On November 25, 1991, the USPTO mailed to Berneike a "Notification of Acceptance of Application under 35 U.S.C. § 371 and 37 CFR 1.494 or 1.495."  Thus, the USPTO determined that the

8

'870 Application was properly filed in the United States under 35 U.S.C. § 371 and either 37 C.F.R. § 1.494 or § 1.495, _i.e._, that it met the requirements for entering the national stage in the United States under the PCT.

51.   The Notification of Acceptance states:

The applicant is hereby advised that the United States Patent and Trademark Office in its capacity as a ☒ Designated Office, ☐ Elected Office, has determined that the above identified international application has met the requirements of 35 U.S.C. § 371 and 37 CFR ☒ 1.494, ☐ 1.495 and is ACCEPTED for national patentability examination in the United States Patent and Trademark Office.

52.   The § 1.494 box on the Notification of Acceptance form was mistakenly marked instead of the § 1.495 box, which was the only section of the Regulations under which the USPTO could have accepted the '870 Application as properly filed.  (As it happens, the same USPTO employee filled in both this form and the Missing Requirements form referred to above in Findings of Fact Nos. 40-45).

53.   The foregoing clerical error in marking the § 1.494 box is obvious because the '870 Application was filed on September 27, 1991--which was more than 20 months after the April 19, 1989, priority date--and therefore the '870 Application would not have met the requirements for entering the national stage under Chapter I of the PCT and 37 C.F.R. § 1.494.

9

54.  Because the '870 Application was filed on September 27, 1991, within 30 months after the April 19, 1989, priority date, the '870 Application met the requirements for entering the national stage under Chapter II of the PCT and 37 C.F.R. § 1.495, so long as a Demand electing the United States was timely filed. (*See* Findings of Fact Nos. 35, 36, and 37, above.)

55.  If a Demand electing the United States had not been timely filed, the '870 Application would not have met the requirements of Chapter I or Chapter II of the PCT, and the USPTO would not have accepted the '870 Application under 35 U.S.C. § 371.

56.  Because the USPTO accepted the '870 Application under 35 U.S.C. § 371 and issued its Notice of Acceptance to that effect, the '870 Application necessarily met all the requirements for entering the national stage under Chapter II of the PCT, including the requirement that a Demand electing the United States be filed no later than November 19, 1990.

57.  The patent offices of Japan and Canada also accepted the PCT Application for national stage entry under Chapter II of the PCT (i.e., more than 20 months but fewer than 30 months after the April 19, 1989, priority date), and it is exceedingly improbable and virtually inconceivable that the patent offices in three different nations at different times and in different places would have all mistakenly accepted the PCT Application for national stage

10

entry under Chapter II of the PCT if a Demand electing those countries had not been filed with the EPO.

58. It is no less improbable and inconceivable that the Applicants filed a Demand electing both Canada and Japan but not the United States, given the fact that the United States, as found above in Finding of Fact No. 31, was the Applicants' highest priority for patent protection.

59. The Japanese translation of the PCT Application, which has been translated into English, states: "Request for preliminary examination Requested."   This direct evidence that a Demand electing Japan was timely filed provides further circumstantial proof that a timely Demand electing the United States was filed at the same time.

60. When the '870 Application was filed, the USPTO maintained two files for PCT applications: (i) a file under the PCT application number for the international stage; and (ii) a file under the United States application number for the national stage.

61. The Demand is missing from the file wrapper for the '870 Application, but may have been placed in the separate international file.   The parties attempted to search the international file for the '870 Application, but were informed that the USPTO could not find it.

62. The evidence is not clear and convincing that a Demand electing the United States was not timely filed with the EPO.

11

63.   Krisanne Thornton was the patent examiner who performed the substantive examination of the '870 Application (the "Examiner").

64.   On November 27, 1992, the Examiner sent to Berneike an Examiner's Action notification rejecting numerous claims in the '870 Application as being unpatentable over the combination of two prior art references: German Democratic Republic Patent No. DD271454, dated September 6, 1989 (the "East German Patent"); and United States Patent No. 4,999,471, dated June 5, 1989 (the "Guarneri Patent").

65.   On January 21, 1993, the USPTO received Berneike's response to the rejection, in which he stated that the effective filing dates of both the East German Patent and the Guarnari Patent were subsequent to the effective filing date of the '870 Application, such that they were not properly considered prior art.

66.   On April 21, 1993, the Examiner conducted a telephonic interview with Berneike.  The Examiner's interview notes reflect that based on Berneike's representation in response to the notice of rejection, the Examiner requested from Berneike a copy of the translation of the German priority document in order to confirm "continuity in the priory doc[ument]."  A copy of the Examiner's interview notes was mailed to Berneike on April 30, 1993.

67.   Also on April 30, 1993, the Examiner mailed to Berneike an Examiner's Action notification in which she again rejected the

claims in the '870 patent on the ground that they were unpatentable over the East German Patent and the Guarnari Patent.  The Examiner explained the reason for the continued rejection as follows:

> Applicants set forth the assertion that the dates of both [the Guarnari Patent] and [the East German Patent] are subsequent to the effective date of the ['870] application, that date being April 19, 1989 provided by the filing date of the German priority document, however, until such a time as Applicants submit a translation of that priority document so that continuity in the present application can be confirmed, the above cited rejections are maintained and deemed proper.

Thus, the Examiner did not rely on Berneike's assertion that the '870 Application was entitled to a foreign priority date.

68.  In response to the April 30, 1993 rejection, Berneike submitted to the Examiner a certified translation of the German Application.

69.  On June 28, 1993, the Examiner mailed to Berneike a "Notice of Allowability," in which she stated that the previously rejected claims were being accepted because "Applicant supplied a copy of the translation of the priority document in support of the effective filing date of this application and therefore overcomes the rejection set forth in paper No. 14 as the references relied upon have dates subsequent to the effective filing date of the present application."

70.  The Supervisory Patent Examiner, Robert J. Warden, also approved the allowance.

13

71. On December 14, 1993, the '000 Patent issued to ABB-S as assignee.   ABB-S appears as assignee on the face of the '000 Patent.

72. Micro-Waste had no conversations with the Inventors from which it could have gained personal knowledge as to any intent or state of mind of the Inventors in prosecuting the '000 Patent.

73. Micro-Waste had no conversations with the Inventors' representatives from which it could have gained personal knowledge as to any intent or state of mind of the Inventors' representatives in prosecuting the '000 Patent.

74. The evidence is not clear and convincing that the Inventors, Berneike, or any other person who was substantively involved in the preparation and prosecution of the '870 Application and who was associated with the Inventors or ABB-S, failed to disclose information known to the Applicants to be material to patentability.

75. Even if the Inventors, Berneike, and/or ABB-S failed to disclose material information to the USPTO, there is no clear and convincing evidence--either direct or circumstantial--that they did so with the intent to deceive or mislead the USPTO.   There is no factual basis from which such a deceptive intent can be inferred.

76. There was no inequitable conduct in procuring the '000 Patent.

14

IV.   <u>Whether the Patent is Invalid Due to Anticipation</u>

77.   The critical date for the '000 Patent against which prior art is measured for purposes of 35 U.S.C. § 102(b) is April 16, 1989.   (*See* Conclusions of Law Nos. 24, 25.)

78.   Micro-Waste at trial did not attempt to prove by clear and convincing evidence that any of Claims 2-17 of the '000 Patent are invalid.

79.   Micro-Waste has not argued that any of the alleged prior art references introduced into evidence invalidates any of Claims 2-17 of the '000 Patent.  Micro-Waste's challenges based on alleged anticipation were only to Claims 1 and 18.

80.   Cusack testified that he had first learned of the Sanitec Technology in 1987, during his employment by CE-E, and that he began "marketing" the Sanitec Technology in the United States in 1988.

81.   Delloiacovo, another employee of CE-E who was instrumental in evaluating the German technology for CE-E, testified that CE-E made no effort to sell the Sanitec Technology in the United States prior to the spring of 1989 and that it did not become a product line for the company until late 1989.

82.   Although CE-E had a growing interest in the technology and its possible appeal in the United States, and attempted to cultivate interest among others, the company did not become engaged

in actual sales efforts in the United States until mid-to-late 1989.

83.  The apparatus that is the subject of the '000 Patent was not the subject of an offer for sale in the United States before the critical date of April 16, 1989.

84.  Vetco Sanitec created a video in German about a Sanitec MDU being operated in Germany, and the video was later translated to English (the "Marketing Video") for use in England.

85.  The extant Marketing Video is undated, although the year "1987" was written on its external cover at some unknown later date by Cusack.

86.  The script presented in the Marketing Video, however, recounts that the Sanitec MDU project started in July 1986 and had continued for over two years.  From this intrinsic evidence it is apparent that the Marketing Video was not filmed at least until after July 1988.

87.  Cusack's testimony that he showed the Marketing Video at conferences and sales meetings as early as 1987 and showed it to potential customers beginning in 1988, is uncorroborated and, based on intrinsic evidence from the video itself, is evidently mistaken.

88.  The evidence in any event is not clear and convincing that the Marketing Video was disseminated and/or publicly accessible before the April 16, 1989, critical date.

89.  In June 1988, a German paper entitled, "Disposal of Infectious Hospital Wastes through Disinfection with Microwaves Results of Research Using the "Gottinger Model" (the "German Paper") was given before the 21st Annual Convention of the Austrian Association for Hygiene, Microbiology, and Preventative Medicine in Baden/Vienna, Austria (the "Convention").

90.  The evidence is not clear and convincing that printed copies of the German Paper were disseminated and/or publicly accessible at the Convention.

91.  The German Paper was subsequently published as an article in HYGIENE+MEDIZIN Magazine (the "German Magazine Article").

92.  Although Micro-Waste contends that the German Magazine Article appeared in the July/August publication of HYGIENE+MEDIZIN Magazine, the Magazine Article itself is not dated.

93.  Cusack, whose recollection of dates in other contexts was demonstrably faulty, testified that he included English translations of the German Paper and/or German Magazine Article in marketing materials that he sent to potential customers in the late-1988 to 1989 time frame, but his testimony is entirely uncorroborated.

94.  The evidence is not clear and convincing that the German Paper and/or undated German Magazine Article was disseminated and/or publicly accessible before the April 16, 1989, critical date.

17

95. Although Cusack testified that he enclosed an Abstract entitled "Disposal of Hospital Specific Waste by Microwave Disinfection: Investigations on the Gottinger Model" (the "Abstract") in marketing materials that he sent to potential customers in the late-1988 to 1989 time frame, Cusack's testimony again is uncorroborated.

96. The Abstract itself is not dated, and Cusack could not recall the date of the Abstract.

97. The evidence is not clear and convincing that the Abstract was disseminated and/or publicly accessible before the April 16, 1989, critical date.

98. In the fall of 1988, a Second National Symposium on Infectious Waste Management (the "Conference") was held. The Conference was held in San Francisco, California on September 19-20, 1988, and again in Boston, Massachusetts on October 3-4, 1988.

99. The organizers of the Conference restricted all presenters, including Cusack, from making any sales pitches.

100. Cusack's presentation at the conference was a slide presentation entitled, "Innovative New Technology for Disinfection of Infectious Wastes: The Vetco Sanitec Microwave Disinfection System" (the "Slide Presentation"), which was an abstract of a paper of the same name authored by Cusack and Leinski (the "Conference Paper") (collectively, the "Conference Materials").

18

101.  The evidence is not clear and convincing that copies of the Conference Paper were disseminated or were made publicly accessible at the Conference.

102.  The evidence is not clear and convincing that the Slide Presentation was continuously on display throughout the Conference or that copies of the Slide Presentation were disseminated or were made publicly accessible at the Conference.

103.  Although Cusack testified that he was offering the MDU machine for sale with his slide presentation, this testimony varied sharply with his previous sworn testimony that it "was marketing, not sales, per se.  We were trying to generate market--sales leads from the marketing effort," and that the purpose of the Slide Presentation was "for the same purpose of marketing, trying to find out if we could find customers.  Our job was to come home with business cards of interested people that might buy the machine."

104.  One of the slides states that CE-E is "looking to install a demonstration unit in the United States within six months."

105.  One of the slides contained in the Slide Presentation depicts a simple or schematic drawing of a "Microwave Waste Disposal Unit."  Although labels are affixed to some parts of the drawing, no written explanation accompanies the drawing.

106.  Although Cusack testified that he included copies of the Conference Materials in marketing materials that he sent to

potential customers in the late-1988 to 1989 time frame, Cusack's testimony is again uncorroborated.

107. The evidence is not clear and convincing that the Conference Materials were disseminated and/or were publicly accessible before the critical date of April 16, 1989.

108. On April 10, 1989, an article entitled, "Combustion Engineering Inc. Affiliate Uses Microwaves to Treat Medical Waste" was published in The Wall Street Journal (the "WSJ Article").

109. In the WSJ Article, the author states: "The Stamford, Conn. engineering and environmental concern [CE-E] said it plans to introduce the Sanitec system in the U.S. after the successful operation of a prototype at a German hospital."

110. The WSJ Article describes the Sanitec Technology in only general terms and does not disclose all of the elements or limitations contained in Claim 1 or all of the steps in Process Claim 18 of the '000 Patent; nor is there clear and convincing evidence that anything in the WSJ Article would enable one of skill in the art to make and use the apparatus disclosed in Claim 1 or practice the process in Claim 18 of the '000 Patent.

111. CE-E published a Journal, which it circulated internally to its employees and the employees of other CE companies.

112. The Spring 1989 issue of CE-E's Journal included an article written by Cusack, entitled, "Infectious Waste Microwave Disinfection Technology Now Available in U.S." (the "Spring 1989

CE-E Journal"). The Spring 1989 CE-Journal Article provided general information about the Sanitec Technology and concluded by stating, "Contact John Cusack at (203) 328-2355 for more information."

113.   The Spring 1989 CE-E Journal Article is not dated, and the evidence is not clear and convincing that the Spring 1989 CE-Journal Article was disseminated and/or was publicly accessible before the April 16, 1989, critical date.

114.   In June 1989, in response to a request for information on the Sanitec Technology, CE-E sent to Bollinger, then an employee of CE-Impell, a sales brochure describing the Sanitec Technology (the "Vetco Sanitec Brochure").

115.   The Vetco Sanitec Brochure is not dated, and the evidence is not clear and convincing that the Vetco Sanitec Brochure was disseminated and/or publicly accessible before the April 16, 1989, critical date.

116.   Cusack's testimony that he enclosed copies of the Vetco Sanitec Brochure in marketing materials that he sent to potential customers in the late-1988 to 1989 time frame is again uncorroborated.

117.   Cusack created a set of "Responses to Typical Questions About Sanitec System" (the "FAQ Document").

118.   The FAQ Document is not dated, but Cusack believes the typed version was prepared sometime after March 1989.

21

119.   A handwritten note on the FAQ Document includes the date "June 1989."

120.   The evidence is not clear and convincing that the FAQ document was created or disseminated and/or publicly was accessible before the April 16, 1989, critical date.

121.   Although the Sanitec Technology was in use in Europe before the April 16, 1989, critical date, the evidence is not clear and convincing that the Sanitec MDUs were on sale in the United States before April 16, 1989.

122.   In fact, the first MDU that CE-E sold in the United States was a unit imported from Germany and installed at Forsyth Memorial Hospital ("Forsyth") in Winston-Salem, North Carolina in February 1990, fulfilling a sales contract made in the latter part of 1989.

123.   In May, 1990, a second MDU was imported from Germany and installed at Integrated Environmental Systems ("IES") in Oakland, California.  This sale also occurred long after the critical date.

124.   Cusack was not designated by Micro-Waste as an expert witness and was not allowed to claim he was one at trial.

125.   Micro-Waste did not allege in its pleading or include in the Joint Pretrial Order any claim that the '000 Patent is invalid under 35 U.S.C. § 103(a).

126.   Micro-Waste neither argued nor presented any evidence at trial that the '000 Patent is invalid under 35 U.S.C. § 103(a).

22

127.  The '000 Patent is not invalid under 35 U.S.C. § 102(b) or § 103(a).

  A.  Comparison of "Heating Means" Limitation in Claim 1 (see Conclusions of Law Nos. 79-92) with Alleged Prior Printed Publications

128.  The Marketing Video makes no reference to an oil system or electrical coils.

129.  The evidence is not clear and convincing that the Marketing Video contains or depicts a heating means for the temperature maintenance zone consisting of either electrical heating coils or a double walled partial jacket filled with superheated steam or hot oil.

130.  The German Magazine Article refers to a thermal oil jacket surrounding the microwave chamber, but does not describe a device with a thermal oil jacket around the temperature maintenance chamber.

131.  The evidence is not clear and convincing that the German Magazine Article describes a heating means for the temperature maintenance chamber consisting of either electrical heating coils or a double walled partial jacket filled with superheated steam or hot oil.

132.  The evidence is not clear and convincing that the Abstract discloses a heating means for the temperature maintenance

23

chamber consisting of either electrical heating coils or a double walled partial jacket filled with superheated steam or hot oil.

133.   The Conference Paper in its technical specifications describes a temperature maintenance chamber, but does not describe a heating means consisting either of electric heating coils or a double walled partial jacket filled with superheated steam or hot oil.

134.   The evidence is not clear and convincing that the Conference Paper discloses a heating means for the temperature maintenance chamber consisting of either electrical heating coils or a double walled partial jacket filled with superheated steam or hot oil.

135.   The Conference Slides do not disclose a temperature maintenance chamber.

136.   The evidence is not clear and convincing that the Conference Slides disclose a heating means for the temperature maintenance chamber consisting of either electrical heating coils or a double walled partial jacket filled with superheated steam or hot oil.

137.   The evidence is not clear and convincing that the WSJ Article discloses a heating means for the temperature maintenance chamber consisting of either electrical heating coils or a double walled partial jacket filled with superheated steam or hot oil.

24

138.   The Spring 1989 CE-E Journal Article does not refer to a temperature maintenance chamber, nor does it refer to a jacket around such a chamber, whether filled with steam or oil.

139.   The evidence is not clear and convincing that the Spring 1989 CE-E Journal Article discloses a heating means for the temperature maintenance chamber consisting of either electrical heating coils or a double walled partial jacket filled with superheated steam or hot oil.

140.   The Vetco Sanitec Brochure contains a diagram that makes no reference to thermal oil or electrical heating coils.

141.   The evidence is not clear and convincing that the Vetco Sanitec Brochure discloses a heating means for the temperature maintenance chamber consisting of either electrical heating coils or a double walled partial jacket filled with superheated steam or hot oil.

142.   The FAQ Document includes a diagram identical to that in the Slide Presentation, which does not identify a temperature maintenance chamber.

143.   The evidence is not clear and convincing that the FAQ Document discloses a heating means for the temperature maintenance chamber consisting of either electrical heating coils or a double walled partial jacket filled with superheated steam or hot oil.

25

B.    Comparison of the Eight Steps of the Process
      Claim 18 (see Conclusions of Law Nos. 93-122)
      with Alleged Prior Printed Publications

144.   The evidence is not clear and convincing that the Marketing Video includes steps 3, 5, 6 or 7 of Claim 18.

145.   The evidence is not clear and convincing that the German Magazine Article includes steps 3 or 7 of Claim 18.

146.   The evidence is not clear and convincing that the Abstract includes steps 3 or 7 of Claim 18.

147.   The evidence is not clear and convincing that the Conference Materials include steps 3 or 7 of Claim 18.

148.   The evidence is not clear and convincing that the WSJ Article includes steps 3, 5, 6 or 7 of Claim 18.

149.   The evidence is not clear and convincing that the Spring 1989 CE-E Journal Article includes steps 1, 3, 5, 6 or 7 of Claim 18.

150.   The evidence is not clear and convincing that the Vetco Sanitec Brochure includes steps 3 or 7 of Claim 18.

151.   The evidence is not clear and convincing that the FAQ Document includes steps 3, 5, 6 or 7 of Claim 18.

V.    The Trademarks

152.   The trademarks at issue are Trademark Reg. No. 1,991,211 and Trademark Reg. No, 2,238,405.

26

153.   Trademark Reg. No. 1,991,211 covers the trademark "SANITEC, INC." (the "'211 Trademark").

154.   Industries is the assignee of the entire interest of the '211 Trademark.

155.   The assignment of the '211 Trademark to Industries is recorded at Reel/Frame 2796/0362 in the assignment records of the USPTO.

156.   The assignor of the '211 Trademark to Industries is Group.

157.   Industries had no rights in the mark "SANITEC" before to February 17, 2004.

158.   Industries does not use the exact trademark "SANITEC, INC."

159.   Trademark Reg. No, 2,238,405 was cancelled from the U.S. Trademark Register.


VI.   The Facts Regarding (i) Alleged Conversion by Micro-Waste, (ii) Alleged Patent Infringement by Micro-Waste, (iii) Alleged Lanham Act and Unfair Competition by Micro-Waste, (iv) Alleged Fraudulent Inducement of the License Agreement by Micro-Waste, (v) Alleged Breach of the License Agreement by Industries, and (vi) Alleged Damages Sustained by Micro-Waste from Industries's Breach of the License Agreement


160.   Bollinger first became involved with the Sanitec Technology in 1989 when he was employed at ABB Impell, which was owned by CE.

27

161.   In the fall of 1989, Miro-Waste entered into an oral representative agreement with ABB-S, whereby Bollinger would work to obtain regulatory approval of the Sanitec Technology for use in Texas and certain surrounding states in exchange for exclusive distribution rights in those states.   This oral agreement is no longer in effect.

162.   In November 1991, Bollinger left his employment with ABB Impell.

163.   In December 1991, Micro-Waste entered into a written Representative Agreement with ABB-S (the "1991 Agreement").

164.   Bollinger signed the 1991 Agreement on behalf of Micro-Waste, and Cusack, then ABB-S's President, signed the 1991 Agreement on behalf of ABB-S.

165.   The 1991 Agreement authorized Micro-Waste to sell and service Sanitec MDUs in Texas and certain surrounding states.

166.   The 1991 Agreement had an initial one-year term and included a renewal provision.   Although there is no writing reflecting a formal renewal of the 1991 Agreement, the 1991 Agreement was never terminated, and the parties continued to operate as if the 1991 Agreement was still in effect at least into 1997.

167.   In 1994, Micro-Waste sold a mobile Sanitec MDU to the Harris County Hospital District (the "HCHD").

28

168.  In 1994, Asea Brown Boveri Inc. ("ABB"), of which ABB-S was an indirect subsidiary, issued Confidential Offering Materials (the "Offering Materials") to a limited number of recipients in connection with the possible sale of ABB-S "for the sole purpose of assisting each recipient in deciding whether to proceed with further investigation of [ABB-S]."  The Offering Materials were prepared "for information purposes only" and were delivered "subject to the terms, and the prior execution by each recipient, of a confidentiality agreement."  The Offering Materials were to be used "only by the recipient and only for the purposes set forth in the Confidentiality Agreement" and could not be "photocopied, reproduced or distributed to any other person at any time except strictly in accordance with the terms of the Confidentiality Agreement."

169.  Micro-Waste was a recipient of the Offering Materials but it did not purchase ABB-S.

170.  In January 1995, Micro-Waste entered into a Confidentiality Agreement with ABB-S (the "Confidentiality Agreement"), to protect the confidentiality of certain information disclosed by ABB-S to Micro-Waste to allow Micro-Waste to consider providing manufacturing services for its hospital medical waste microwave disinfection units.

171.  The Confidentiality Agreement provided that Micro-Waste would treat as confidential and not disclose to others any of the

29

ABB-S information without securing the prior written consent of ABB-S for a period of five (5) years from the date of disclosures of any such information, and further that upon receipt of demand by ABB-S, Micro-Waste would return all confidential information to ABB-S within five (5) days of receipt of request including all originals and copies [of the information] prepared by Micro-Waste.

172.  Pursuant to the Confidentiality Agreement, ABB-S sent to Micro-Waste a partial set of drawings related to the Sanitec Technology (the "ABB-S Drawings") for the purpose of enabling Micro-Waste to provide a manufacturing proposal to ABB-S.

173.  ABB-S did not accept Micro-Waste's manufacturing proposal.

174.  ABB-S never demanded return of the ABB-S Drawings, and Bollinger/Micro-Waste never returned the ABB-S Drawings.

175.  There is no evidence that Industries presently owns, has legal possession of, or is otherwise entitled to possession of the ABB-S Drawings.

176.  Micro-Waste did not convert any of Industries's intellectual property.

177.  In May 1997, Micro-Waste entered into a second written Representative Agreement with Inc. (the "1997 Agreement").

178.  Bollinger signed the 1997 Agreement on behalf of Micro-Waste, and Inc.'s Vice President, Joseph Delloiacovo, signed for Inc.

30

179.  The 1997 Agreement authorized Micro-Waste to sell and service Sanitec MDUs in Texas and certain surrounding states.

180.  The 1997 Agreement had an initial three-year term and included a renewal provision.  Although there is no written renewal of the 1997 Agreement, Inc. and its successors, Ltd. and then Group, together with Micro-Waste, continued at least into 2003 to operate as if the 1997 Agreement was still in effect.

181.  After Group's formation in February 2002, Group became the owner of the Sanitec Technology, including the '000 Patent and the Trademarks.

182.  Also in 2002, there was litigation related to the Sanitec Technology pending in Delaware and Ohio among Group, its predecessor Ltd., and other parties.

183.  In November 2002, the HCHD issued a capital equipment requisition to procure a new mobile Sanitec MDU (the "HCHD Project").

184.  David Jones ("Jones") with the HCHD e-mailed Bollinger to inform him that a request for bids on the HCHD Project would go out soon.

185.  Shortly thereafter, the HCHD issued a request for proposals for a mobile MDU.  The deadline for submitting responsive bids was Monday, March 3, 2003.

186.  On February 13, 2003, Bollinger learned from Mark Taitz ("Taitz"), the long-time director of business development for

Group, that Group would be shutting down its operations effective the next day, February 14, 2003.

187.   Concerned that he was about to submit to the HCHD a bid that, given Group's turmoil, he might not be able to fulfill with a Sanitec MDU, Bollinger contacted Group's Delloiacovo for advice.

188.   Delloiacovo advised that he did not believe that Group would be able to manufacture and supply a Sanitec MDU for the HCHD Project, given Group's turmoil.

189.   Delloiacovo recommended, however, that Bollinger submit to Group a proposal to allow Micro-Waste to manufacture and supply the Sanitec MDU for the HCHD Project in exchange for a $100,000 one-time royalty (the "License Proposal").

190.   Delloiacovo advised Bollinger to contact Ventre and Ventre's counsel, Patrick Hanley ("Hanley"), with the License Proposal.

191.   A few days later Delloiacovo sent an e-mail to Bollinger providing to him Hanley's address.

192.   On Tuesday, February 25, 2003, Delloiacovo sent an e-mail to Ventre and Hanley informing them that Bollinger would be contacting them with a License Proposal.  Delloiacovo stated that Bollinger "knows our situation and will be able to manage the assembly of a [MDU] if we allow him to use the drawings," and that Delloiacovo told Bollinger that "a $100,000 one-time royalty would

be reasonable to offer Guardian for permission to use the [Sanitec Technology] IP" for the HCHD project.

193.   Two days later Delloiacovo again e-mailed Ventre and Hanley, stating that Bollinger had left messages with Hanley about the License Proposal; that Micro-Waste's bid on the HCHD project was due the following Monday, March 3, 2003; and that all Bollinger needed was Ventre's and/or Hanley's permission to submit Micro-Waste's bid.   Delloiacovo asked Ventre and/or Hanley to call Bollinger about the License Proposal.

194.   The following day, after speaking with Hanley about the License Proposal, Bollinger both e-mailed and faxed to Hanley a letter of intent outlining the terms of Micro-Waste's License Proposal ("the "LOI"), and sent copies of the email to Ventre and Delloiacovo.

195.   In the LOI, Bollinger stated that the HCHD "has finally approved funding of the mobile MDU and has issued to Micro-Waste Corporation a Request for Proposal (RFP) specifically for purchase of another mobile MDU, Sanitec Model HG-A-250M," and that Micro-Waste's bid was due on March 4, 2003 at 9:00 a.m.

196.   Bollinger's proposed agreement contained the following terms:

> • Group would allow Micro-Waste the right to use Group's intellectual property to manufacture a mobile MDU Model HG-A-250M for sale to the HCHD, which would include providing necessary drawings, listings of components and suppliers, and software source code.

33

- Micro-Waste would be responsible for all scopes of work, including providing the components, contracting their installation into a mobile configuration, and providing final testing and startup.

- In exchange, Micro-Waste would pay a $100,000 royalty upon delivery of the MDU to the HCHD.

197.  Bollinger concluded the LOI by stating: "Given the very short time-frame for submittal of our proposal to HCHD, we request your approval of the intent of this agreement by signature below. We will then provide [Group] a formal contract with the specifics prior to our entering into a final contract with HCHD."

198.  When Bollinger had not received an executed copy of the LOI by Monday morning, he called Hanley but was unable to reach him.

199.  Bollinger then called Delloiacovo, who assured Bollinger that Ventre found the LOI acceptable and that Bollinger was authorized to submit Micro-Waste's bid.

200.  After speaking with Bollinger, Delloiacovo e-mailed Hanley and Ventre and informed them that he had spoken with Bollinger on his way to submit Micro-Waste's bid on the HCHD Project; that since Bollinger had not heard from Hanley or Ventre, Delloiacovo assured Bollinger that Guardian and Group "were in agreement to allow him to bid per his LOI sent to [Hanley and Ventre] last Friday"; and that Hanley and Ventre needed to follow up with Bollinger with a signed copy of the LOI.

34

201.  Group authorized and/or impliedly licensed Bollinger to submit Micro-Waste's bid.

202.  On March 3, 2003, Micro-Waste submitted its bid to the HCHD.

203.  Micro-Waste's bid did not infringe the '000 Patent.

204.  Micro-Waste's bid contained no false or misleading statements of fact about the Sanitec Technology.

205.  There is no evidence that anything in Micro-Waste's bid actually deceived or tended to deceive the HCHD.

206.  Even if there were a false or misleading statement of fact in Micro-Waste's bid, any such statement did not influence the HCHD's purchasing decisions.

207.  There is no evidence that anything in Micro-Waste's bid was likely to injure Group or Industries in any way.

208.  Micro-Waste was the sole bidder on the HCHD Project.

209.  The following day, Delloiacovo sent to Ventre and Hanley another e-mail, in which he stated: "As you know, Microwaste is submitting the bid on a mobile unit for Harris County in Texas today based on the agreement we discussed."

210.  On March 18, 2003, Delloiacovo sent to Ventre and Hanley another e-mail, stating that Bollinger had reported that he still had not received a signed copy of the LOI from Ventre, reminding them that the bid had already been submitted and Micro-Waste was the sole bidder, and urging them to follow up with Bollinger.

35

211.  On March 20, 2003, Delloiacovo sent to Ventre and Hanley another e-mail, stating: "After getting no return calls from either of you, Bob Bollinger has been calling me over the last few days to ask for help in getting your attention and proceeding with this project.  He needs to have the LOI signed and returned to him, so he can proceed to close the deal.  If you are not interested in pursuing this any further, please let Bob know or advise me and I will tell Bob.  Please give him the courtesy of a reply."

212.  On March 27, 2003, Delloiacovo sent a copy of the LOI to Ventre and Hanley for Ventre's signature.

213.  On April 8, 2003, Bollinger e-mailed Hanley and Ventre, with a copy to Dellaiocovo, to inform them that Micro-Waste had been the sole bidder on the HCHD Project and had been informed that it would be awarded the contract "within a week."  Thus, Bollinger stated, Micro-Waste was "still very interested in moving forward with the agreement," and Bollinger again asked Group to sign the LOI (which Bollinger attached to the e-mail) and return it to Micro-Waste by e-mail or overnight mail.

214.  In addition, Bollinger stated: "If you are interested, we also have high probability orders for an additional 4 stationary MDU's and a couple of lower probability orders which we would like you to consider under a similar arrangement.  As you can see, we are hopeful we can keep this product line alive and begin to return some money to your investors."

36

215.  On April 15, 2003, after discussions with the HCHD about the HCHD Project and in response to the HCHD's request that Micro-Waste lower its bid, Micro-Waste sent an amended bid to the HCHD, in which Micro-Waste offered to provide a less expensive stationary Sanitec MDU instead of the more expensive mobile Sanitec MDU.

216.  On April 17, 2003, after discussions with Hanley, Bollinger faxed another copy of the LOI to Hanley for Ventre's signature.  In the fax cover letter, Bollinger stated that "[b]ased on a meeting with [HCHD] they may desire a stationary unit instead of a mobile unit."  Bollinger asked Hanley to have Ventre sign the LOI and return it to Bollinger as soon as possible.

217.  A few hours later, Ventre signed the LOI in his capacity as "Sole Member Guardian Investments, LLC/Sanitec Group LLC," and Hanley faxed an executed copy of the LOI back to Bollinger.

218.  In an April 19, 2003 e-mail to Bollinger, Delloiacovo stated that he was glad to hear that Ventre had signed off on the LOI and that he could "also look into how we can secure [a deal in] Malta as well."  (The Government of Malta had awarded a contract for a Sanitec MDU to another Sanitec representative).  Delloiacovo also stated that he would like to receive compensation for his efforts and assistance, and he asked Bollinger to give some thought to going into business together.

37

219.   Bollinger and Delloiacovo did not go into business together.   Instead, Delloiacovo went to work for a company called Waste Reduction by Waste Reduction ("WR[2]").

220.   On May 8, 2003, the Harris County Purchasing Agent notified Micro-Waste by letter that because the bids it had received for the HCHD Project for a mobile unit exceeded departmental budget guidelines, the mobile unit project had been cancelled.   The Purchasing Agent further stated that "[i]t is anticipated that the project will be rebid at a later date with modified specifications."

221.   Although Bollinger received the Purchasing Agent's letter on or about May 13, 2003, Bollinger, anticipating that a new request for proposal from the HCHD was imminent, and having the previous week advised Hanley that HCHD may desire a stationary unit instead of a mobile unit (*see* Finding of Fact No. 216, above), did not notify Hanley or Ventre of the HCHD's cancellation of the Mobile Unit Project.

222.   On May 12, 2003, the HCHD approved the specifications for a stationary MDU, and the HCHD placed an invitation to bid advertisement in the Houston Chronicle on May 16, 23, and 30, 2003. The deadline for submitting responsive bids was June 3, 2003.

223.   On May 20, 2003, the HCHD contacted Bollinger to inform him that the specifications for the stationary MDU project were available on the HCHD's website.

38

224.   Around the same time, Bollinger sought a more comprehensive license agreement from Group.

225.   On May 19, 2003, Bollinger e-mailed a proposed non-exclusive license agreement (the "License Agreement") to Hanley. In the accompanying e-mail, Bollinger stated:

> Per our discussion, attached is the formal License Agreement between Micro-Waste Corporation and Sanitec Group, LLC as agreed to in the Letter of Intent of April 17, 2003.   The License Agreement is very simple, and provides for a non-exclusive agreement for Micro-Waste to manufacture and sell the Sanitec MDU's.   My business attorney and intellectual property attorney collaborated on the drafting of the Agreement so that it would most likely survive the rigors of the financial and legal trials Sanitec Group LLC is weathering to the benefit of both Micro-Waste and Sanitec Group LLC.

226.   The following morning, May 20, 2003, Bollinger sent another copy of the License Agreement to Hanley by fax.

227.   Later that afternoon, Hanley called Bollinger and asked him to revise one of the paragraphs in the License Agreement because Hanley did not feel it accurately described the LOI. Micro-Waste's attorney, Marc McDonald ("McDonald") made the requested change and faxed a replacement page to Hanley the next day.

228.   The License Agreement provides that Group grants to Micro-Waste "a perpetual, non-exclusive, worldwide right and license to all of Group's patent, copyright, trade secret know how, proprietary and intellectual property rights in the PRODUCT, along

39

with the right and license to manufacture, have manufactured, produce, alter, modify, use, market and sell the PRODUCT in all fields."

229. The License Agreement defines the term "PRODUCT" to mean:

> [A]ny Sanitec Microwave Disinfection Unit, including but not limited to the following models of such unit: HG-A-100S, HG-A-100M, HG-A-250S, and HG-A-250M (S-Stationary; M - Mobile), together with all modifications, improvements, enhancements, additions, derivative products or works and updates, and all related manuals, brochures, instructions, specifications, descriptions, component lists, supplier lists, drawings, software, source codes, and similar materials as well as all patent, copyright, trade secret, know how, proprietary and intellectual property rights associated with any of the above.

230. In exchange, Micro-Waste promises to pay a $100,000 royalty on the first MDU that it manufactured and sold and a $75,000 royalty on each additional MDU that it manufactured and sold thereafter. The License Agreement provides that royalty payments are to be paid to Group no later than 30 days after the receipt of the sale proceeds by Micro-Waste.

231. The License Agreement contains a termination provision, which states that Group may elect to terminate the License Agreement only in the event of any breach or default by Micro-Waste, "which breach continues uncured for a period of thirty (30)

days after written notice specifying the breach of default is provided" to Micro-Waste.[1]

232.    The License Agreement also contains an indemnity provision, which states:

> Product Liability and Infringement.  LICENSOR shall at all times during the term of this Agreement, and thereafter, indemnify, defend, and hold harmless LICENSEE, its officers, directors, employees, affiliates, successors, and assigns against any claim, proceeding, demand, liability, or expenses (including legal expenses and reasonable attorney's fees) which relates to injury to persons or property, or against any other claim, proceeding, demand, expense, and liability of any kind whatsoever resulting from the producing, marketing, sale, distribution, or other use of PRODUCT manufactured and/or sold prior to the effective date under this Agreement or arising from any obligation of LICENSOR hereunder.

233.    In addition, the License Agreement contains an attorney's fees provision, which provides that "[i]n the event

---

[1]    Fewer than 30 days before trial Industries delivered a letter to Micro-Waste, again insisting that the License Agreement is void, but complaining that if it is valid and enforceable that Micro-Waste has been in default and breach of one or more of its provisions and thus, Industries was providing "notice of default and termination pursuant to § 6.01 of the alleged License Agreement."  Industries describes this in its Revised Proposed Findings of Fact and Conclusions of Law as a "termination letter." The letter, however, does not comply with Article 6.01 of the License Agreement.  That article permits the Licensor "to elect to terminate" the License Agreement for breach or default by the Licensee only "if the breach continues uncured for a period of thirty (30) days after written notice specifying the breach or default is provided to LICENSEE by LICENSOR."  There is no proof Industries gave to Micro-Waste the required 30 days written notice and commensurate time to cure any alleged default before delivering its "termination letter" almost on the eve of trial.  The License Agreement was not terminated.

41

there is a breach of this Agreement and it becomes necessary for either party to employ an attorney, either to enforce or terminate this Agreement, the breaching party shall pay the other party its reasonable attorney's fees, expenses, and court costs incurred in connection therewith.

234.  Ventre did not immediately sign the License Agreement.

235.  On May 22, 2003, Bollinger was at the office in New Jersey that Group had closed when it shut down operations on February 14th, attempting to pick up drawings related to the Sanitec Technology from the landlord.  Bollinger could not get the drawings because they were held for foreclosure by the landlord due to Group's failure to pay rent.  Bollinger contacted Hanley, who advised him to contact John Climaco ("Climaco"), the attorney for ABB Sanitec West, Inc. ("ABB-S West"), to see if ABB-S West would provide drawings to Bollinger.  Climaco, in turn, advised Bollinger to contact Harkess.  Harkess advised Bollinger that he (Harkess) was in negotiations with Group to obtain Group's assets; that his only business plan was to lease Sanitec MDUs in the United States; and that he did not want Bollinger to manufacture Sanitec MDUs.

236.  Bollinger was unable to obtain Group's drawings, which evidently were either lost after the office was closed or sold for the benefit of the landlord at a sheriff's sale in New Jersey.

237.  On June 3, 2003, Micro-Waste submitted its bid for a stationary MDU to the HCHD.

42

238.  Micro-Waste's bid contained no false or misleading statements of fact about the Sanitec Technology.

239.  There is no evidence that anything in Micro-Waste's bid actually deceived or tended to deceive the HCHD.

240.  Even if there were a false or misleading statement of fact in Micro-Waste's bid, there is no evidence that any such statement influenced the HCHD's purchasing decisions.

241.  There is no evidence that anything in Micro-Waste's bid is likely to injure Group or Industries in any way.

242.  Sterile Technology Industries, Inc. ("STI") also submitted a bid for a stationary MDU to the HCHD.  Although STI's bid was lower than Micro-Waste's bid, STI's technology had not been approved for use by the Texas Department of Health.

243.  At some point, Hanley told Bollinger to run Micro-Waste's manufacturing proposal by Timothy Fischer ("Fischer"), the attorney representing certain noteholders of Guardian (the "Noteholders") who had brought a lawsuit against Guardian and Ventre, among others.  Hanley and Ventre wanted to make sure that the Noteholders were in agreement with Bollinger's proposal, and Hanley told Bollinger that if he (Bollinger) could convince Fischer to go along with the agreement, Ventre would go along it, too.  Hanley also made Bollinger aware of litigation pending between Ventre/Guardian/Group and ABB Sanitec West, Inc. ("ABB-S West") and

told Bollinger that he had better contact Climaco, the attorney for ABB-S West, and get him on board as well.

244.   In July 2003, Bollinger called Harkess and asked him to agree to Micro-Waste's manufacturing proposal with Group.  Harkess again stated that he did not want Bollinger to manufacture Sanitec MDUs.

245.   On July 16, 2003, Hanley received a phone call from Fischer.  Fischer stated that he and Doug Haman ("Haman"), who represented other Noteholders, had just spoken with Bollinger about an agreement relating to the use of the Sanitec Technology by Bollinger for the sale of several Sanitec MDUs and that he and Haman and their clients believed the deal should go forward.

246.   Accordingly, Hanley called Bollinger and asked him to fax over another copy of the License Agreement, which Bollinger's lawyer, McDonald, did.

247.   The same day, Ventre, in behalf of Group and acting in his capacity as President of Group, signed the License Agreement which recited it was "made effective as of the 17th of April, 2003," and Hanley sent a copy of the executed License Agreement to Bollinger by overnight mail.

248.   Ventre was a duly authorized officer of Group and was authorized to enter into the License Agreement with Micro-Waste.

249.   There is no evidence that Ventre would not have executed the License Agreement had he known that the HCHD Mobile Unit

44

Project had been cancelled in May 2003, and that HCHD had requested new bids for a stationary unit.

250.  Micro-Waste made no false statements to Group knowingly and/or intentionally or recklessly in disregard of facts known to Micro-Waste, that caused Group to grant the License Agreement.

251.  Ventre executed the License Agreement for Group because he thought it was in the best business interest of Group to do so and that the Noteholders desired for him to do so.

252.  Under the License Agreement Micro-Waste had authority to use the Sanitec Technology intellectual property to manufacture and sell the accused product to HCHD.

253.  On August 13, 2003, the Director of Transportation for the HCHD, William Jackson ("Jackson"), recommended to the HCHD Purchasing Agent that Micro-Waste's bid for a stationary MDU be accepted.

254.  In early November, 2003, Industries learned of the LOI and that Group had entered into the License Agreement with Micro-Waste.

255.  On December 4, 2003, the HCHD accepted Micro-Waste's bid for a stationary Sanitec MDU.

256.  On January 5, 2004, Micro-Waste's counsel sent a letter to Industries's counsel seeking assurances from Industries that Industries intended to honor the License Agreement and asking where royalty payments should be sent.

45

257.   In February, 2004, Industries, Group, Guardian, Ventre, and the Noteholders all executed a Settlement Agreement (the "Settlement Agreement").

258.   Harkess signed the Settlement Agreement on behalf of Industries as its President.

259.   Fischer signed the Settlement Agreement on behalf of the Noteholders he represented (certain Plaintiffs in *Wagner v. Fiorini*).

260.   Haman signed the Settlement Agreement on behalf of the Noteholders he represented (certain Plaintiffs in *Wagner v. Fiorini*).

261.   Ventre signed the Settlement Agreement on behalf of Group as its sole member, Guardian as its sole member, and himself individually.

262.   Bollinger, who had not been involved in the controversies and litigation among those parties, was not a party to the Settlement Agreement.

263.   Under the Settlement Agreement, Group agreed to assign the Sanitec Technology IP to Industries, and Industries agreed to make up to $4,000,000 in payments to the Noteholders from out of Industries' future sales of MDUs.

264.   The Noteholders represented and warranted to Industries in the Settlement Agreement "that, prior to November 1, 2003, neither they nor their counsel, if any, were aware of a purported

46

License Agreement dated as of April 17, 2003 ("Micro-Waste License Agreement") between Group and Micro-Waste Corporation ("Micro-Waste")."

265.   In the Settlement Agreement, Ventre and Group represented and warranted to the other parties that, in April 2003:

(i)   at the time Ventre executed any agreement, contract or understanding between Group and Micro-Waste, including without limitation, any letter agreement and Micro-Waste License Agreement, Micro-Waste, including Robert Bollinger, was aware of a dispute as to the ownership of the intellectual property that is the subject of the Settlement Agreement, including the litigation related thereto;

(ii)   prior to executing the Micro-Waste License Agreement Group did not obtain an independent economic analysis as to the amount of royalties to be paid pursuant to that agreement;

(iii)   Ventre believed he could sign the License Agreement;

(iv)   in April 2003, Robert Bollinger represented to Group and Ventre that: (A) Micro-Waste was the sole bidder on a contract for a mobile microwave disinfectant unit, (B) the contract would shortly be awarded to Micro-Waste for such unit, (C) Micro-Waste would pay a $100,000 royalty;

(vi)   based on Bollinger's representations, Ventre executed the Micro-Wave License Agreement; and

(v)   despite Bollinger's representation, Micro-Waste has not made any payments, including royalty payments, to Group or Ventre.

266.   The parties to the Settlement Agreement assigned and transferred to Industries any claim or cause of action that they had or may have had against Micro-Waste.

267.   Pursuant to the Settlement Agreement, Ventre on behalf of Group executed for delivery to Industries an Assignment of the '000 Patent and a Trademark Assignment of the federally registered trademark SANITEC, INC.  On February 18, 2004, Harkess signed the Assignment of the '000 Patent and the Trademark Assignment of the federally registered trademark SANITEC, INC. on behalf of Industries.

268.   In May 2004, Micro-Waste began manufacturing the stationary Sanitec MDU for the HCHD.

269.   On July 30, 2004, Industries filed the present lawsuit (the "Lawsuit") against Micro-Waste, asserting against Micro-Waste, among other things, a claim of patent infringement.

270.   There is no evidence that Industries filed the Lawsuit in bad faith and its filing of the Lawsuit is not sanctionable under Rule 11(c).

271.   Industries's claim for patent infringement constitutes a material breach of the License Agreement.  (*See* Conclusions of Law Nos. 146-151.)

272.   Due to Industries's breach of the License Agreement, Micro-Waste employed an attorney to defend and enforce the License Agreement against Industries.

48

273.   On August 6, 2004, Micro-Waste's counsel sent another letter to Industries's counsel asking whether Industries acknowledged the validity of Micro-Waste's License Agreement and if so where royalty payments should be sent.

274.   On August 10, 2004, Industries's counsel responded by letter, in which he stated that Micro-Waste was infringing the '000 Patent because the License Agreement was invalid, and to which he attached a copy of Industries's Complaint in this Lawsuit.

275.   On August 11, 2004, Industries's counsel sent a copy of the Complaint in this Lawsuit to the Harris County Purchasing Agent.

276.   There is no evidence that Industries informed the HCHD of the Lawsuit in bad faith.

277.   In February 2005, Micro-Waste delivered a stationary Sanitec MDU to the HCHD.  Because site preparation work needed to be done at Ben Taub General Hospital before the MDU could be installed, the MDU was delivered to an HCHD warehouse.

278.   In April 2005, Micro-Waste received final payment from the HCHD.

279.   By the time that Micro-Waste received final payment, Industries already had breached the License Agreement by filing this suit for patent infringement.  Industries had also not replied to Bollinger's request to acknowledge the License Agreement and inquiry as to where the $100,000 royalty should be paid after

49

Micro-Waste received final payment.  Hence, Micro-Waste did not tender to Industries the $100,000 royalty due under the License Agreement after Micro-Waste received the proceeds from the sale of the stationary Sanitec MDU to the HCHD.

280.  On June 2, 2006, the Harris County Purchasing Agent recommended to the HCHD Board of Managers that the Board approve a bid furnished by Micro-Waste for refurbishing or reconfiguring the Sanitec MDU purchased by the HCHD in 1994 (the "1994 MDU").

281.  On June 27, 2006, Bollinger was notified that the Purchasing Agent's award recommendation was pulled from the June 29, 2006 Board of Managers Agenda due to the "upcoming court proceedings between Micro-Waste and Sanitec."

282.  There is no evidence that the HCHD made an award of the refurbishing of the 1994 MDU or that Micro-Waste will not ultimately receive the contract.

283.  Industries's filing of the patent infringement claim against Micro-Waste did not cause Micro-Waste to lose profits related to refurbishing or reconfiguring the 1994 MDU.

284.  In June 2006, the HCHD completed site preparation and moved the stationary Sanitec MDU from the warehouse where it had been stored to Ben Taub General Hospital.

285.  The delay in installing the stationary Sanitec MDU at Ben Taub General Hospital was attributable to HCHD's failure to contract for and complete site preparation work prior to June 2006,

rather than to Industries's filing of a patent infringement claim against Micro-Waste.

286. There is no evidence that Micro-Waste's claimed prospects for sales under its License Agreement of anywhere from four to seven additional MDUs involved prospective purchasers who actually purchased MDUs or comparable equipment from other vendors.

287. It cannot be found from a preponderance of the evidence that negotiations had sufficiently advanced between Micro-Waste and any of its prospective purchasers that a sale in all reasonable probability would have been completed but for Industries's breach of the License Agreement.

288. Micro-Waste's proven damages resulting from Industries's breach of the License Agreement consist only of its reasonable attorney's fees, expenses, and court costs incurred in defending and enforcing the License Agreement, the amounts of which the Court agreed could be proved by affidavit after trial if not agreed upon by the parties.

VII. Group's Agreements with Platinum Funding

289. On March 1, 2002, Platinum Funding Corporation ("Platinum") and Group entered into a Factoring Agreement (the "Factoring Agreement"), pursuant to which Group agreed to tender to Platinum invoices rendered to Group's customers for, among other

things, goods sold and delivered to and services performed for, Group's customers.

290.  To secure Group's performance of its obligations under the Factoring Agreement, Platinum and Group executed a Security Agreement dated March 1, 2002 (the "Security Agreement"), which created a security interest in favor of Platinum in, among other collateral, Group's "General Intangibles."

291.  The Security Agreement required Group to preserve the collateral for the benefit of Platinum and prohibited Group from encumbering the collateral without Platinum's approval.

292.  On March 20, 2002, Platinum perfected its security interest created by the Security Agreement by filing a UCC Financing Statement with the Secretary of State of Delaware, where Group was incorporated.

293.  Micro-Waste was not a party to either the Factoring Agreement or the Security Agreement.

294.  Bollinger had no actual knowledge of the Security Agreement.

295.  In 2003, Group ceased placing any accounts receivables with Platinum, failed to pay any of the fees set forth in the Factoring Agreement, and allowed its inventory and equipment to be removed and dissipated and/or sold.

296.  On May 1, 2003, Platinum notified Group by letter that Group was in default of its obligations under the Factoring

Agreement and exercised its right to terminate the Factoring Agreement.

297. After five days passed with no cure of the default by Group, Platinum had, under the Security Agreement, "all of the rights and remedies of a secured party under the Uniform Commercial Code and . . . full power and authority to sell or otherwise dispose of the Collateral or any part thereof." Platinum never exercised its right to sell or dispose of the collateral.

298. On November 24, 2003, Platinum and Industries entered into an agreement, whereby Platinum assigned all of its rights under the Factoring Agreement and Security Agreement, and all of the collateral pledged to Platinum thereunder, to Industries, in exchange for $88,462.48, which represented the outstanding amounts due to Platinum under the Factoring Agreement.

299. On December 17, 2003, Industries filed a Complaint in Foreclosure and Designation of Trial Counsel in the Superior Court of New Jersey against Group, Delloiacovo, Wayne Danson, and Guardian (the "Complaint in Foreclosure"). The Complaint sought foreclosure of all of Group's collateral, including its intellectual property.

300. Defendants Group and Guardian defaulted, and the individual defendants executed Consent Judgments in the New Jersey suit.

301. On March 5, 2004, the Superior Court of New Jersey entered Final Judgment in Foreclosure in which it "transferred and assigned" to Industries "all of Defendant Group's right, title and interest" *both* in the '000 Patent *and* in the Micro-Waste License Agreement. Group's rights in the trademarks were also transferred to Industries. Defendants Group and Guardian were also foreclosed from all right of redemption in and to the collateral under the Security Agreement, including the '000 Patent, the Micro-Waste License Agreement, and the trademarks.

302. The Final Judgment did not extinguish the Micro-Waste License Agreement but rather transferred to Industries all of Group's rights in it, which were the rights and corresponding obligations of the Licensor, who was entitled to receive royalties as agreed upon the sale by Licensee of MDUs.

303. Industries thereby succeeded to all rights and obligations that Group had had as Licensor under the License Agreement with Micro-Waste.

## Conclusions of Law

**The Court makes the following conclusions of law:**

I. <u>Patent Applications Under the Patent Cooperation Treaty</u>

1. A Patent Cooperation Treaty (PCT) application designating the United States has two stages: an international stage and a national stage.

2.   The filing date is the same in both stages, *i.e.*, the filing date of the international stage application is also the filing date for the national stage of the application.   35 U.S.C. § 363; PCT Article 11(3).

3.   Under the law applicable at that time, a PCT application could enter the national stage in the United States either: (1) within 20 months of the priority date, under Chapter I of the PCT; or (2) if within 19 months of the priority date a Demand for International Preliminary Examination ("Demand") was filed in the international stage, within 30 months, under Chapter II of the PCT. PCT Articles 22(1), 31, 39(1) (as printed in the MANUAL OF PATENT EXAMINING PROCEDURE [hereinafter "MPEP"], (5th ed., rev. 10, 1989); 37 C.F.R. §§ 1.494, 1.495 (1991).

4.   The aforementioned deadlines are calculated from the priority date, in this case, April 19, 1989.

5.   To proceed under Chapter I of the PCT, the PCT Application must have entered the national stage in the United States no later than 20 months from April 19, 1989, or December 19, 1990.   PCT Article 22(1); 37 C.F.R. § 1.494.

6.   To proceed under Chapter II of the PCT, a Demand must have been filed no later than 19 months from April 19, 1989, or November 19, 1990; and the PCT Application must have entered the national stage in the United States no later than 30 months from

April 19, 1989, or October 19, 1991.  PCT Articles 31, 39(1); 37 C.F.R. § 1.495.

7.   The filing date of the '870 Application is the PCT international filing date, or April 16, 1990.  *See* 35 U.S.C. § 363.

8.   U.S. national stage applications are not taken up for examination until all of the requirements of 35 U.S.C. § 371(c) are met.  37 C.F.R. § 1.496(a) (1991).

9.   In 1991, 35 U.S.C. § 371(c) provided in relevant part that the applicant shall file in the USPTO:

> (1)  the national fee prescribed under 376(a)(4) of this part;
>
> (2)  a copy of the international application, unless not required under subsection (a) of this section or already communicated by the international bureau, and a translation into the English language of the international application, if it was filed in another language;
>
> . . .
>
> (4)  an oath or declaration of the inventor (or other person authorized under chapter 11 of this title) complying with the requirements of section 115 of this title and with regulations prescribed for oaths or declarations of applicants[.]

10.   In 1991, applicants had a 2-month grace period in which to complete all of the 35 U.S.C. § 371(c) requirements.  Thus, including the grace period, the deadline for completion of the § 371(c) requirements for an application entering the national stage under Chapter I of the PCT was 22 months from the priority

date, and the deadline for completion of the § 371(c) requirements for an application entering the national stage under Chapter II of the PCT was 32 months from the priority date.  35 U.S.C. § 371; 37 C.F.R. §§ 1.494, 1.495 (1991).

11.  In 1991, the date of completion of all 35 U.S.C. § 371 requirements (the "371(c) Date") was also the date on which the application became available as a prior art reference under 35 U.S.C. § 102(e) (the "102(e) Date").  35 U.S.C. §§ 102(e), 363; PCT Article 64(4)(a).

12.  In 1991, the information printed in the "Filing Date" box on the file wrapper was the date of completion of the 35 U.S.C. § 371(c) requirements rather than the actual international filing date.  MPEP § 1893.03(b).

13.  October 31, 1991 is the 371(c) Date and 102(e) Date of the '870 Application.  (*See* Finding of Fact No. 48.)

14.  On December 14, 1993, the '000 Patent issued to ABB-S.

15.  The PCT Application and subsequent '870 Application in the national stage in the United States were filed and processed in accordance with the PCT and applicable United States law and regulations, and the '000 Patent when issued was in all respects in conformity with applicable law.  (*See* Findings of Fact Nos. 20-76).

16.  Plaintiff Industries ultimately became assignee of the '000 Patent in February and March 2004.  (*See* Findings of Fact Nos. 267, 303.)

57

II.   <u>Proof Required to Show Patent Invalidity</u>

17.   Because a patent issued by the USPTO is presumed valid, *see* 35 U.S.C. § 282, a party challenging the validity of a patent bears the burden of proving invalidity by clear and convincing evidence.  <u>Transclean Corp. v. Bridgewood Servs., Inc.</u>, 290 F.3d 1364, 1370 (Fed. Cir. 2002); <u>Monon Corp. v. Stoughton Trailers, Inc.</u>, 239 F.3d 1253, 1257 (Fed. Cir. 2001); <u>Baxter Int'l Inc. v. COBE Labs., Inc.</u>, 88 F.3d 1054, 1057 (Fed. Cir. 1996).

18.   Additionally, a party challenging validity must prove by clear and convincing evidence all issues relating to invalidity. *See*, *e.g.*, <u>Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.</u>, 264 F.3d 1344, 1350 (Fed. Cir. 2001) ("The presumption of validity, 35 U.S.C. § 282 (1994), requires those challenging validity to introduce clear and convincing evidence on all issues relating to the status of a particular reference as prior art."); <u>Mahurkar v. C.R. Bard, Inc.</u>, 79 F.3d 1572, 1576 (Fed. Cir. 1996) (same).

19.   When determining the validity of the claims of a patent, each claim must be separately considered; a party challenging validity must prove the invalidity of *each* claim by clear and convincing evidence.  35 U.S.C. § 282; <u>Rosco, Inc. v. Mirror Lite Co.</u>, 304 F.3d 1373, 1379 (Fed. Cir. 2002); <u>Sandt Tech, Ltd.</u>, 264 F.3d at 1350.

20.   "Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid

independently of the validity of the other claims; [and] dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim." Dow Chem. Co. v. Mee Indus., Inc., 341 F.3d 1370, 1375 (Fed. Cir. 2003) (quoting Dayco Prods., Inc. v. Containment, Inc., 329 F.3d 1358, 1370 (Fed. Cir. 2003) (quoting 35 U.S.C. § 282))).

21. Corroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest. See Finnigan Corp. v. Int'l Trade Comm'n, 180 F.3d 1354, 1369-70 (Fed. Cir. 1999) (holding that the uncorroborated testimony of a credible, disinterested witness was insufficient as a matter of law to establish the invalidity of the patent claims in question because "such testimony alone cannot surmount the hurdle that the clear and convincing evidence standard imposes"); see also TypeRight Keyboard Corp. v. Microsoft Corp., 374 F.3d 1151, 1159 (Fed. Cir. 2004).

A.    Requirements to Show Invalidity due to Anticipation: 35 U.S.C. § 102(b)

22. Section 102(b) of the Patent Act provides in pertinent part that "[a] person shall be entitled to a patent unless . . . the invention was . . . described in a printed publication in this or a foreign country . . . or on sale in this country, more than one year prior to the date of the application for patent in the United States[.]" 35 U.S.C. § 102(b). Thus, a person who

59

invents a patentable product or process is under no obligation to file an application for patent within any specific period, but once the product or process is described in a printed publication or in this country is on sale, the person must apply for a patent within one year or be statutorily barred from obtaining a patent.

23.   "Under 35 U.S.C. § 363, the United States filing date, for § 102(b) purposes, of a patent application filed under the PCT in which the United States is designated, is the date of the PCT application." Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1044 (Fed. Cir. 2001); accord Broad. Innovation, LLC v. Charter Commc'ns, Inc., 420 F.3d 1364, 1368 (Fed. Cir. 2005) (citing 35 U.S.C. § 363; MPEP § 1893.03(b) (8th ed., rev. 4, Oct. 2005)).

24.   "The date exactly one year prior to the date of [the United States] application for the patent is known as the critical date." Scaltech, Inc. v. Retec/Tetra, LLC, 269 F.3d 1321, 1327 (Fed. Cir. 2001).

25.   Because the PCT Application was filed on April 16, 1990, the critical date for purposes of 35 U.S.C. § 102(b) is April 16, 1989.

26.   An assessment of the validity of a patent claim in light of an alleged prior printed publication or offer of sale involves, first, determining whether a document is truly a "printed publication" or whether the invention was truly "on sale" within

60

the meaning of § 102(b)--a question of law based on the underlying facts. *See* <u>Minton v. Nat'l Ass'n of Secs. Dealers, Inc.</u>, 336 F.3d 1373, 1376 (Fed. Cir. 2003); *see also* <u>In re Klopfenstein</u>, 380 F.3d 1345, 1347 (Fed. Cir. 2004) ("Where no facts are in dispute, the question of whether a reference represents a 'printed publication' is a question of law.").

27.   The next step is claim construction, which is also a legal determination. <u>Minton</u>, 336 F.3d at 1376; <u>Akami Techs., Inc. v. Cable & Wireless Internet Servs.</u>, 344 F.3d 1186, 1192 (Fed. Cir. 2003).

28.   The final step involves a comparison of the asserted claims with the device or process that was described in a printed publication or that was offered for sale. <u>Minton</u>, 336 F.3d at 1376. "This comparison process involves fact-finding, and is for the fact-finder in the first instance." <u>Key Pharms. v. Hercon Labs. Corp.</u>, 161 F.3d 709, 714 (Fed. Cir. 1997); *see also* <u>Elan Pharms., Inc. v. Mayo Found. for Med. Educ. & Research</u>, 346 F.3d 1051, 1054 (Fed. Cir. 2003) ("Whether a prior art reference anticipates an invention is a question of fact.").

29.   A patent claim is invalid as anticipated under § 102(b) if "each and every limitation is found either expressly or inherently in a single prior art reference." <u>Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.</u>, 246 F.3d 1368, 1374 (Fed. Cir. 2001) (quoting <u>Celeritas Techs., Ltd. v. Rockwell Int'l Corp.</u>, 150 F.3d

61

1354, 1360 (Fed. Cir. 1998)); *see also* <u>Brown v. 3M</u>, 265 F.3d 1349, 1351 (Fed. Cir. 2001) ("To anticipate, every element and limitation of the claimed invention must be found in a single prior art reference, arranged as in the claim.").

30.   The party alleging anticipation must prove how a prior publication meets the limitations of the claims. *See* <u>Koito Mfg. Co. v. Turn-Key-Tech, L.L.C.</u>, 31 F.3d 1142, 1151 (Fed. Cir. 2004). Evidence offered by a party asserting anticipation must be "'testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference.'" <u>Id.</u> at 1152 (quoting <u>Schumber v. Lab. Computer Sys., Inc.</u>, 308 F.3d 1304, 1315-16 (Fed. Cir. 2002).

31.   "To anticipate, the reference must also enable one of skill in the art to make and use the claimed invention." <u>Bristol-Myers Squibb Co.</u>, 246 F.3d at 1374; *see also* <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 403 F.3d 1331, 1342 (Fed. Cir. 2005) ("For prior art to anticipate a claim, 'it must be sufficient to enable one with ordinary skill in the art to practice the invention.'") (quoting <u>Minn. Mining & Mfg. Co. v. Chemque, Inc.</u>, 303 F.3d 1294, 1301 (Fed. Cir. 2002)); <u>Merck & Co. v. Teva Pharms USA, Inc.</u>, 347 F.3d 1367, 1372 (Fed. Cir. 2003) ("An 'anticipating' reference must describe all of the elements and limitations of the claim in a single reference, and enable one of skill in the field of the

62

invention to make and use the claimed invention."); <u>PPG Indus.,</u> <u>Inc. v. Guardian Indus. Corp.</u>, 75 F.3d 1558, 1566 (Fed. Cir. 1996) ("To anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject matter.").

32.   "Enablement requires that 'the prior art reference must teach one of ordinary skill in the art to make or carry out the claimed invention without undue experimentation.'" <u>Elan Pharms.,</u> <u>Inc.</u>, 346 F.3d at 1054 (quoting <u>Minn. Mining & Mfg. Co.</u>, 303 F.3d at 1301).   "The determination as to what level of experimentation is 'undue,' so as to render a disclosure non-enabling, is made from the viewpoint of persons experienced in the field of the invention." <u>Elan Pharms.</u>, 346 F.3d at 1055.

33.   This "enablement" requirement parallels the language of the enablement requirement of 35 U.S.C. § 112, which requires the specification of a patent to contain a written description of the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the [invention]." 35 U.S.C. § 112.

B.   The "On Sale" Bar

34.   Under the standard set forth in <u>Pfaff v. Wells Elec.,</u> <u>Inc.</u>, 119 S. Ct. 304 (1998), the on-sale bar applies when two requirements are satisfied before the critical date.   "First, the

product [allegedly invoking the on-sale bar] must be the subject of a commercial offer for sale" prior to the critical date.  <u>Id.</u> at 311.  Second, the invention must be "ready for patenting" prior to the critical date.  <u>Id.</u> at 312.[2]

35.  With respect to the first requirement, "[o]nly an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer of sale under § 102(b)."  <u>Group One, Ltd.</u>, 254 F.3d at 1048 (interpreting <u>Pfaff</u>).   In determining whether a communication or series of communications rises to the level of a commercial offer for sale, the Federal Circuit looks to traditional contract principles, such as the Uniform Commercial Code ("UCC") and the Restatement of Contracts.  <u>Id.</u> at 1047.[3]

---

[2] This requirement "can be satisfied in at least two ways: by proof of a reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the inventions that were sufficiently specific to enable a person skilled in the art to practice the invention."  <u>Id.</u>

[3] "We do note in passing that contract law traditionally recognizes that mere advertising and promoting of a product may be nothing more than an invitation for offers, while responding to such an invitation may itself be an offer.  RESTATEMENT (SECOND) OF CONTRACTS § 26 (1981).   In any given circumstance, who is the offeror, and what constitutes a definite offer, requires looking closely at the language of the proposal itself.   Language suggesting a legal offer, such as 'I offer' or 'I promise' can be contrasted with language suggesting more preliminary negotiations, such as 'I quote' or 'are you interested.'  Differing phrases are evidence of differing intent, but no one phrase is necessarily controlling.  <u>Id.</u> §§ 24, 26."  <u>Group One, Ltd.</u>, 254 F.3d at 1048.

36.  "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." RESTATEMENT (SECOND) OF CONTRACTS § 24. Communications that do not manifest an intent to be bound cannot be considered offers for sale. *See* <u>Linear Tech. Corp. v. Micrel, Inc.</u>, 275 F.3d 1040, 1050, 1051 (Fed. Cir. 2001).

37.  The mere publication of preliminary data sheets and promotional information cannot constitute an offer for sale, as such activities only indicate preparation to place an item on sale. *See* <u>Linear Tech. Corp.</u>, 275 F.3d at 1050.

38.  The Vetco Sanitec Brochure does not communicate or otherwise manifest to its readers any intent on the part of CE-E to be bound to any sales transaction.  (*See* Findings of Fact Nos. 114-116.)

39.  None of the language in the Vetco Sanitec Brochure even arguably "offers" the MDU for sale.  *See* <u>Linear Tech.</u>, 275 F.3d at 1051 ("In the absence of a clear indication to the contrary, the communications between the LTC sales representatives and the customers must be regarded as merely preliminary negotiations at most designed to enable customers to submit offers to buy.").

40.  The Vetco Sanitec Brochure contains no commercial offer to which CE-E could be bound.

65

41.  The Vetco Sanitec Brochure does not constitute an offer of sale.

42.  At the Conference, Cusack "did not make offers for sale but rather laid the necessary groundwork for future offers." Linear Tech., 275 F.3d at 1050.  (*See* Findings of Fact Nos. 98-107.)

43.  The Conference Materials do not communicate any bargain or anything that would justify another person in understanding that he could give assent and thereby conclude a bargain with CE-E.

44.  No person could be reasonably justified in interpreting the Conference Materials as a commercial offer to which CE-E could be bound.

45.  The Conference Materials were not intended to be and do not constitute an offer of sale.

46.  None of the pre-critical date communications between the sales representatives of the relevant Sanitec entity and their potential customers rose to the level of an offer for sale that would form a contract if accepted.

47.  The February 1990 sale to Forsyth in North Carolina does not invalidate the '000 Patent because it occurred after the April 16, 1989, critical date.  (*See* Finding of Fact No. 122.)

48.  The May 1990 sale to IES in California does not invalidate the '000 Patent because it occurred after the April 16, 1989, critical date.  (*See* Finding of Fact No. 123.)

66

49.   The fact that several Sanitec MDUs were in operation in Germany before the April 16, 1989, critical date does not invalidate the '000 Patent under § 102(b).

50.   The Sanitec MDU is not shown by clear and convincing evidence to have been the subject of a commercial offer for sale in the United States before the critical date of April 16, 1989, and was not "on sale" in this country within the meaning of 35 U.S.C. § 102(b).  (*See* Finding of Fact No. 81, and generally Findings of Fact Nos. 80-123.)

C.   The Prior Printed Publications Bar

51.   In order for a document to qualify as a "printed publication" within the meaning of § 102(b), the party challenging validity must prove by clear and convincing evidence that the document was "publicly accessible"; that is, the document must have been "'sufficiently accessible to the public interested in the art.'"  In re Klopfenstein, 380 F.3d at 1348 (quoting In re Cronyn, 890 F.2d 1158, 1160 (Fed. Cir. 1989)).  "[D]issemination and public accessibility are the keys to the legal determination [of] whether a prior art reference was 'published'."  In re Cronyn, 890 F.3d at 1160.

52.   The evidence is not clear and convincing that the Marketing Video was publicly accessible before the April 16, 1989, critical date.  (*See* Findings of Fact Nos. 84-88.)

67

53.   The  evidence  is  not  clear  and  convincing  that  the
Marketing Video is an invalidating printed publication.

54.   The evidence is not clear and convincing that the German
Paper was publicly accessible before the April 16, 1989, critical
date.  (*See* Findings of Fact Nos. 89-90, 93-94.)

55.   The evidence is not clear and convincing that the German
Paper is an invalidating printed publication.

56.   The evidence is not clear and convincing that the German
Magazine Article was publicly accessible before the April 16, 1989,
critical date.  (*See* Findings of Fact Nos. 91-94.)

57.   The evidence is not clear and convincing that the German
Magazine Article is an invalidating printed publication.

58.   The  evidence  is  not  clear  and  convincing  that  the
Abstract  was  publicly  accessible  before  the  April  16,  1989,
critical date.  (*See* Findings of Fact Nos. 95-97.)

59.   The  evidence  is  not  clear  and  convincing  that  the
Abstract is an invalidating printed publication.

60.   The  evidence  is  not  clear  and  convincing  that  the
Conference  Materials  were  publicly  accessible  before  April  16,
1989.  (*See* Findings of Fact Nos. 98-107.)

61.   The  evidence  is  not  clear  and  convincing  that  the
Conference Materials are invalidating printed publications.

62.  The evidence is not clear and convincing that the Spring 1989 CE-Journal Article was publicly accessible before April 16, 1989.  (*See* Findings of Fact Nos. 111-113.)

63.  The evidence is not clear and convincing that the Spring 1989 CE-Journal Article is an invalidating printed publication.

64.  The evidence is not clear and convincing that the Vetco Sanitec Brochure was publicly accessible before the April 16, 1989, critical date.  (*See* Findings of Fact Nos. 114-116.)

65.  The evidence is not clear and convincing that the Vetco Sanitec Brochure is an invalidating printed publication.

66.  The evidence is not clear and convincing that the FAQ Document was publicly accessible before the April 16, 1989, critical date.  (*See* Findings of Fact Nos. 117-120.)

67.  The evidence is not clear and convincing that the April 10, 1989, FAQ Document is an invalidating printed publication.

68.  There is clear and convincing evidence that the WSJ Article was publicly accessible before the April 16, 1989, critical date.  (*See* Findings of Fact Nos. 108-110.)

69.  The evidence is not clear and convincing that the WSJ Article is an invalidating printed publication.  (*See* Findings of Fact Nos. 110, 137, 148.)

D.   Construction of Claims 1 and 18 for Comparison
     Purposes on Anticipation

70.   Claim construction is strictly a legal question for the
court.   Markman v. Westview Instruments, Inc., 52 F.3d 967, 979
(Fed. Cir. 1995), aff'd, 116 S. Ct. 1384 (1996).

71.   "It is well-settled that, in interpreting an asserted
claim, the court should look first to the intrinsic evidence of
record, i.e., the patent itself, including the claims, the
specification and, if in evidence, the prosecution history."
Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.
Cir. 1996) (citing Markman, 52 F.3d at 979).   "Such intrinsic
evidence is the most significant source of the legally operative
meaning of the disputed claim language."   Vitronics, 90 F.3d at
1582.

72.   Although a Markman hearing provides an opportunity for
the parties to present and for the court to consider extrinsic
evidence, such as expert testimony, pertinent to claim
construction, such a hearing is not required.   Ballard Med. Prods.
v. Allegiance Healthcare Corp., 268 F.3d 1352, 1358 (Fed. Cir.
2001).   The parties to this case agreed in advance of trial that no
Markman hearing was required.

73.   "It is a bedrock principle of patent law that the claims
of a patent define the invention to which the patentee is entitled
the right to exclude."   Phillips v. AWH Corp., 415 F.3d 1303, 1312

(Fed. Cir. 2005) (internal quotation marks and citations omitted).
Thus, "a claim construction analysis must begin and remain centered
on the claim language itself." Innova/Pure Water, Inc. v. Safari
Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004).

74. "[T]he words in a claim are generally given their
ordinary and customary meaning." Vitronics, 90 F.3d at 1582.
"[T]he ordinary and customary meaning of a claim term is the
meaning that the term would have to a person of ordinary skill in
the art in question at the time of the invention." Phillips, 415
F.3d at 1313. This meaning controls unless the intrinsic evidence
clearly redefines the claim term so as to put one reasonably
skilled in the art on notice that the patentee intended to assign
the term a different meaning. Union Carbide Chems. & Plastics
Tech. Corp. v. Shell Oil Co., 308 F.3d 1167, 1177 (Fed. Cir. 2002);
see also Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group,
Inc., 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("Generally, there is a
heavy presumption in favor of the ordinary meaning of claim
language as understood by one of ordinary skill in the art. This
presumption is overcome: (1) where the patentee has chosen to be
his own lexicographer, or (2) where a claim term deprives the claim
of clarity such that there is no means by which the scope of the
claim may be ascertained from the language used.").

75. Because a patentee may "choose to be his own
lexicographer and use terms in a manner other than their ordinary

meaning, as long as the special definition of the term is clearly stated in the patent specification or file history[,]" "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." Vitronics, 90 F.3d at 1582. "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." Id.

76. Other claims of the patent in question can also be valuable sources of enlightenment as to the meaning of a claim, given that claim terms are normally used consistently throughout a patent. Phillips, 415 F.3d at 1314.

77. "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." Id. "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is nor present in the independent claim." Id. at 1314-15.

78. "If an apparatus claim recites a general structure without limiting that structure to a subset of structures, [the Federal Circuit] will generally construe the term to cover all known types of that structure that the patent disclosure supports." CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1369 (Fed. Cir. 2002) (internal quotation marks and citations omitted).

79. Paragraph 6 of 35 U.S.C. § 12 provides that "[a]n element in a claim for a combination may be expressed as a means or step

for performing a specified function without the recital of structure, material, or acts in support thereof." 35 U.S.C. § 12 ¶ 6. Such elements are known as "means-plus-function" or "step-plus-function" elements.

80. If the patentee phrases an element in means-plus-function or step-plus-function format, the element "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6; *see also* CCS Fitness, Inc., 288 F.3d at 1369. Thus, "[d]rafters of means-plus-function claim limitations are statutorily guaranteed a range of equivalents extending beyond that which is explicitly disclosed in the document itself." McGinley v. Franklin Sports, Inc., 262 F.3d 1339, 1347 (Fed. Cir. 2001).

81. "Construction of a means plus function limitation requires identification of the function recited in the claim and a determination of what structures have been disclosed in the specification that correspond to the means for performing that function." Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 297 F.3d 1022, 1032 (Fed. Cir. 2002).

82. "A claim limitation that actually uses the word 'means' invokes a rebuttable presumption that [35 U.S.C.] § 112 ¶ 6 applies." CCS Fitness, Inc., 288 F.3d at 1369.

83. "This presumption can be rebutted where the claim, in addition to the functional language, recites structures sufficient

73

to perform the claimed function in its entirety." <u>Altiris, Inc. v. Symantec Corp.</u>, 318 F.3d 1363, 1375 (Fed. Cir. 2003).

84.   The term "heating means" invokes a rebuttable presumption that 35 U.S.C. § 112 ¶ 6 applies.  *See* <u>Micro Chem., Inc. v. Great Plains Chem. Co., Inc.</u>, 194 F.3d 1250, 1257 (Fed. Cir. 1999) (holding that a claim requiring a "weighing means" used means-plus-function terminology and invoked the presumption that § 112 ¶ 6 applied).

85.   Claim 1, the sole independent apparatus claim, reads:

An apparatus for treating moist infectious refuse with microwaves to heat refuse to at least a minimum temperature for disinfection, said apparatus comprising an outwardly sealable enclosure having a loading section and a treatment section, said loading section constructed and arranged to receive refuse and deliver refuse to said treatment section in a moist condition wherein said treatment section comprises:

a.   a microwave chamber having an inlet and an output end and incorporating a microwave source and a conveying device constructed and arranged to move refuse from said inlet end to said output end past said microwave source for heating refuse to at least said minimum temperature; and

b.   a temperature maintenance chamber having an inlet and an output end, said inlet end connected to said output end of said microwave chamber, said temperature maintenance chamber incorporating a conveying device constructed and arranged to move refuse from said inlet end of said temperature maintenance chamber to said outlet end of said temperature maintenance chamber and heating means for maintaining the refuse at said minimum temperature during movement through said temperature maintenance chamber.

74

86.   For comparison purposes on whether any of the alleged prior printed publications anticipated claim 1 of the '000 Patent, the parties' agreement (*see* Conclusions of Law Nos. 87, 88 below) renders it necessary to construe only the claim term "heating means" for the temperature maintenance chamber.   Applying the means-plus-function presumption of § 112 ¶ 6, Micro-Waste describes as element E(4)(ii) of Claim 1 the following, based on Fig. 2 of the '000 Patent, which teaches what the physical structure of the heating means must be: "wherein the heating means is either electric coils OR a jacket filled with superheated steam or hot oil."   Fig. 2a shows electrical heating coils (40) and Fig. 2b shows a double walled partial jacket (38).

87.   Industries in a judicial admission has adopted Micro-Waste's proposed construction of "heating means" for "all purposes, i.e., infringement and validity."   Document No. 171, at 18.   This is consistent with the principle that a party cannot adopt one construction for anticipation and another for infringement.   *See* Sterner Lighting, Inc. v. Allied Elec. Supply, Inc., 431 F.2d 539, 544 (5th Cir. 1970) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement.").

88.   The Court therefore accepts the parties' agreed construction that the term "heating means" for the temperature chamber in Claim 1 is limited by the requirement for either

75

electrical heating coils or a double walled partial jacket filled with superheated steam or hot oil.

89.   The limitation of Claim 1 that the "heating means" for the temperature maintenance chamber consists of electrical coils or a double walled jacket filled with superheated steam or hot oil, is a limitation not found either expressly or inherently in any of the alleged prior art that Micro-Waste claims was publicly accessible before the critical date.  (*See* Findings of Fact Nos. 128-143.)

90.   Micro-Waste has not established by clear and convincing evidence that each and every limitation is found either expressly or inherently in a single prior art reference, arranged as Claim 1.

91.   Micro-Waste has not established by clear and convincing evidence that any of the alleged prior art references is sufficient to enable one with ordinary skill in the art to practice the invention without undue experimentation.

92.   Micro-Waste has not established by clear and convincing evidence that any of the alleged prior art anticipates Claim 1 of the '000 Patent.

93.   Claim 18, the sole process claim, reads:

A process for continuously heat-treating particulate articles for disinfecting and sterilizing comprising the steps of moistening said articles, passing said articles through a microwave field, mixing said articles during passage through said microwave field, whereby said articles are heated to a disinfecting and sterilizing temperature, passing said articles from said microwave field to a temperature maintenance zone in which said temperature is maintained and wherein said articles are

at least partially compacted and discharging said articles from said temperature maintenance zone.

94. Thus, Claim 18 discloses a process with the following steps:

1. moistening particulate articles;
2. passing the particulate articles through a microwave field;
3. mixing the particulate articles during passage through said microwave field;
4. heating the particulate articles in the microwave field to a disinfecting and sterilizing temperature;
5. passing the particulate articles from the microwave field to a temperature maintenance zone;
6. maintaining the temperature in the temperature maintenance zone;
7. at least partially compacting the particulate articles in the temperature maintenance zone; and
8. discharging the particulate articles from said temperature maintenance zone.

95. Neither party alleges, nor does the Court find, that Claim 18 is in step-plus-function form. Thus, its steps "will be given their ordinarily understood meanings in the art." Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1260 (Fed. Cir. 1999).

96. The parties' constructions of steps 1, 2, 4, and 8 contain no substantive differences and, as both parties give the words used in these steps their ordinary meaning, the Court does the same. The parties differ on their constructions of steps 3, 5, 6, and 7, and the Court therefore construes these steps as follows:

97.  **Step 3.**  Micro-Waste Micro-Waste seeks to limit "mixing" in step 3 to that which "is accomplished by a conveying screw." This proposed limitation relies on the specifications in the '000 patent, which explain:

> To improve a uniform temperature distribution . . . . the conveying device may be constructed as a microwave field distributor in the form of a shaftless metal conveying screw.  This conveying screw consequently produces not only a thorough *mixing* of the refuse to be heated, but also produces multiple reflections, with the result that the occasional differences in heating are smoothed out by direct and indirect heating. . . .  Improved *mixing* can furthermore be achieved by an inclined installation of the microwave chamber and the falling back of the granulated material produced thereby.

98.  Industries contends that "mixing" refers generally to "any degree of combining or blending."  This interpretation derives from the dictionary definition of "mix" as "to combine or blend into one mass," "to combine with another," or "to bring into close association."  *See* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 761 (9th ed. 1987).   None of these definitions specifies the extent to which the substances must be combined or blended.

99.  There is "a heavy presumption that a claim term carries its ordinary and customary meaning."  Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1327 (Fed. Cir. 2003).  "Mixing," in its ordinary sense, does not contemplate the use of a specific device.

78

100.   "[I]nterpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation, . . . which is improper.'" Intervet Am., Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989) (quoting E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed. Cir. 1988)) (emphasis in the original); see also Rambus Inc. v. Infineon Techs. AG, 318 F.3d 1081, 1088 (Fed. Cir. 2003) ("While claims often receive their interpretative context from the specification and the prosecution history, courts may not read limitations into the claims.").

101.   "'[P]articular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments.'" See Rhine v. Casio, Inc., 183 F.3d 1342, 1346 (Fed. Cir. 1999)) (quoting Electro Med. Sys. S.A. v. Cooper Life Sciences, 34 F.3d 1048, 1054, 32 U.S.P.Q.2d 1017, 1021 (Fed. Cir. 1994)).

102.   The specification cited by Micro-Waste does not mandate the use of a conveying screw. Cf. Rhine, 13 F.3d at 1346 (rejecting a proposed claim limitation, though it was included in the preferred embodiment, because the specification did not require it).

103.   **The Court construes "mixing" in Step 3 according to its common meaning, as any degree of combining or blending.**

79

104. **Step 5.** Micro-Waste contends that step 5, "passing particulate articles from said microwave field to a temperature maintenance zone," must be construed as a passing of said articles between two distinct physical areas.

105. A "field" is "a region or space in which a given effect (as magnetism) exists . . . ." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 460. Thus, a microwave field, according to its ordinary meaning, is an area in which there is microwave radiation.

106. A "zone" is "a region or area set off as distinct from surrounding or adjoining parts . . . ." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1372. Thus, the temperature maintenance zone, according to its ordinary meaning, is a distinct area in which the temperature is maintained.

107. It is erroneous to adopt a construction "that . . . eliminates the distinction between . . . terms that is set forth in the written description of the patent itself." AFG Indus., Inc. v. Cardinal IG Co., 239 F.3d 1239, 1249 (Fed. Cir. 2001).

108. The distinction in the terms, "field" and "zone" implies that the microwave irradiation and maintenance of temperature occur in two distinct areas.

109. **The Court construes Step 5 as the passing of the particulate articles from one area where microwave radiation exists to another area described as "the temperature maintenance zone."**

110.  **Step 6.**  Micro-Waste asserts that the maintaining of temperature in the temperature maintenance zone in step 6 is by means of a heating device.

111.  Micro-Waste's proposed limitation of a "heating device" is derived from language in the specification which states, "[i]n order to maintain a minimum temperature, the temperature maintenance chamber is preferably encased by a heating device."

112.  Industries asserts that to "'maintain' means 'to keep in an existing state.'" (quoting WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 718).  Read together with the specification, which states that the "articles so heated are . . . held [to] at [ ] least the minimum temperature during a minimum residence time[,]" the "existing state" is that of a minimum disinfecting or sterilizing temperature.

113.  The ordinary meaning of "maintaining" does not require the use of a heating device.

114.  "Maintaining," in step 6, is not limited to the preferred embodiment disclosed in the specification.  *See* Amgen, Inc., 314 F.3d at 1328 ("[O]ur precedent is clear that claims are not perforce limited to the embodiments disclosed in the specification."); Rhine, 183 F.3d at 1346.

115.  **Step 6, prescribing the "maintaining" of temperature, is construed to mean the holding of the temperature at the disinfecting or sterilizing temperature.**

116. **Step 7.** Micro-Waste contends that "at least partially compacting the particulate articles in the temperature maintenance zone" in step 7 means compaction by "passing refuse from a larger cross-sectional area microwave chamber to a smaller-cross sectional area in the temperature maintenance chamber . . . ."

117. Micro-Waste's proposed construction cites the description of an embodiment of the device in Claim 1.

118. Industries defines the phrase, "at least partially compacting" as any degree of compressing or compacting.

119. Industries's definition is consistent with the specification, which states in its description of the process that "the articles so heated are at least slightly compacted . . . ."

120. To "compact" is "to press together" or "compress." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 267. "Partially" means of or relating to a part rather than the whole; not general or total.

121. "Compacting" is broader than and is therefore not limited to the embodiment cited by Micro-Waste. *See* <u>Rhine</u>, 13 F.3d at 1346.

122. **The Court construes Step 7 to mean the partial compacting or compressing of the particulate articles to any degree while they are in the area where the disinfecting or sterilizing temperature is maintained.**

82

123.   Micro-Waste neither argued nor presented evidence that any of Claims 2-17 are invalid under § 102(b); therefore, the Court need not construe Claims 2-17.[4]

124.   None of the alleged prior art contains all of the steps of the process described in Claim 18.  (*See* Findings of Fact Nos. 144-151.)

125.   Micro-Waste presented no "'testimony from one skilled in the art identify[ing] each claim element, stat[ing] the witnesses' interpretation of the claim element, and explain[ing] in detail how each claim element is disclosed in the prior art reference.'" *See* Koito Mfg. Co. v. Turn-Key-Tech, L.L.C., 31 F.3d 1142, 1151 (Fed. Cir. 2004).

126.   The evidence is not clear and convincing that any of the alleged prior publications are enabling.

127.   Micro-Waste has not established by clear and convincing evidence that any of the alleged prior art anticipates Claim 18 of the '000 Patent.

---

[4] After the trial concluded and the case was under submission, Micro-Waste sent a letter to the Court in which it (1) offered its proposed construction of Claims 2-17 of the '000 Patent, and (2) requested that the Court issue a "final, binding judgment . . . on the construction of [all] of the claims of the '000 Patent for all purposes," to "apply to all current and future issues between the parties regarding the '000 Patent."  This request was not made before trial, is now an untimely request made after the case is under submission, and is DENIED.

III. Patent Unenforceability: Inequitable Conduct

128.   "Applicants for patents have a duty to prosecute patents in the PTO with candor and good faith, including a duty to disclose information known to the applicants to be material to patentability." Purdue Pharma L.P. v. Endo Pharms., Inc., 438 F.3d 1123, 1128 (Fed. Cir. 2006) (citing 37 C.F.R. § 1.56(a) (2004); Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995)). This duty of disclosure is owed by each individual associated with the filing and prosecution of a patent, including the inventors, the prosecuting attorney, and any other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, the assignee, or anyone else to whom there is an obligation to assign the application. 37 C.F.R. § 1.56(c); Molins, 48 F.3d at 1178 n.6.

129.   "A breach of this duty may constitute inequitable conduct, which can arise from an affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive or mislead the PTO." Purdue, 438 F.3d at 1128.

130.   A party asserting that a patent is unenforceable due to inequitable conduct arising from a failure to disclose prior art must prove by clear and convincing evidence: (1) the existence of material prior art, (2) knowledge chargeable to the applicant of that prior art and of its materiality, and (3) the applicant's

84

failure to disclose the prior art, coupled with an intent to deceive or mislead the USPTO.  *See* <u>Purdue</u>, 438 F.3d at 1128; <u>Molins</u>, 48 F.3d at 1178.

131.  In evaluating materiality, the Court looks to the standard set forth in PTO Rule 56.  <u>Purdue</u>, 438 F.3d at 1129 (citing <u>Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.</u>, 394 F.3d 1348, 1352 (Fed. Cir. 2005)).  Because the patent application in this case was pending on March 16, 1992, the current version of Rule 56, rather than the pre-1992 version, applies.  <u>Id.</u> Under the current rule,

> [I]information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
> (1)  It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
>
> (2)  It refutes, or is inconsistent with, a position the applicant takes in:
>
> > (i)  Opposing an argument of unpatentability relied on by the Office, or
> > (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b) (2004).

132.  "Direct evidence of intent to deceive or mislead the PTO is 'rarely available but may be inferred from clear and convincing evidence of the surrounding circumstances.'"  <u>Purdue</u>, 438 F.3d at 1133-34 (quoting <u>Baxter Int'l, Inc. v. McGaw, Inc.</u>, 149 F.3d 1321,

1329 (Fed. 1998)). "Intent to deceive, however, cannot be 'inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent.'" <u>Purdue</u>, 438 F.3d at 1134 (quoting <u>Hebert v. Lisle Corp.</u>, 99 F.3d 1109, 1116 (Fed. Cir. 1996)).   The intent that must be proven is not the intent to withhold, but the intent to deceive the USPTO.  <u>Molins</u>, 48 F.3d at 1178, 1181.

133.   "Once threshold findings of materiality and intent are established, the trial court must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred." <u>Purdue</u>, 438 F.3d at 1128.  "This requires a careful balancing: when the misrepresentation or withheld information is highly material, a lesser quantum of proof is needed to establish the requisite intent.  In contrast, the less material the information, the greater the proof must be." <u>Id.</u> at 1128-29 (citing <u>N.V. Akzo v. E.I. DuPont de Nemours</u>, 810 F.2d 1148, 1153 (Fed. Cir. 1987)).

134.   Micro-Waste failed to prove by clear and convincing evidence that the '000 Patent is unenforceable due to inequitable conduct before the USPTO.  (*See* Findings of Fact Nos. 20-76.)

IV.   <u>The Requirements for Fraudulent Inducement</u>

135.   Fraud in the inducement makes a contract voidable. <u>Olney Sav. & Loan Ass'n v., Trinity Banc Sav. Ass'n</u>, 885 F.2d 266,

86

276 (5th Cir. 1989); <u>L & B Oil Co. v. Arnold</u>, 620 S.W.2d 191, 193 (Tex. App.--Waco 1981, writ dism'd w.o.j.).

136.   Under Texas law, a party establishes a fraudulent inducement claim by showing the elements of a simple fraud claim. <u>Balogh v. Ramos</u>, 978 S.W.2d 696, 701 (Tex. App.--Corpus Christi 1998, pet. denied).

137.   Thus, to prevail on its claim that the License Agreement was fraudulently induced, Industries must establish that: (i) Micro-Waste through Bollinger made a material representation; (ii) the representation was false; (iii) when he made the representation, Bollinger knew it was false or made it recklessly without any knowledge of its truth; (iv) Bollinger made the representation with the intent that Group and/or Ventre should act on it; (v) Group and/or Ventre acted in reliance on the representation; and (vi) Group and/or Ventre suffered injury as a result. *See* <u>Lewis v. Bank of Am. NA</u>, 343 F.3d 540, 545 (5th Cir. 2003); <u>In re FirstMerit Bank, N.A.</u>, 52 S.W.3d 749, 758 (Tex. 2001).

138.   Because Industries predicates its fraudulent inducement claim on Micro-Waste's alleged failure to disclose material facts, as opposed to affirmative misrepresentations, Industries must also prove that Micro-Waste had a duty to disclose the information. <u>Springs Window Fashions Div., Inc. v. Blind Maker, Inc.</u>, 184 S.W.3d 840, 875 (Tex. App.--Austin Jan. 20, 2006) (citing <u>Bradford v. Vento</u>, 48 S.W.3d 749, 755 (Tex. 2001) ("As a general rule, a

failure to disclose information does not constitute fraud unless there is a duty to disclose the information.  Thus, silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent.") (citations omitted)).  Whether a duty to disclose exists is a question of law.  *See* Bradford v. Vento, 997 S.W.2d 713, 725 (Tex. App.--Corpus Christi 1999, pet. granted); Hoggett v. Brown, 971 S.W.2d 472, 487 (Tex. App.--Houston [14th Dist.] 1997, pet. denied).

139.  For fraud by nondisclosure, a duty to disclose arises, *inter alia*, as follows: (i) when one voluntarily discloses information, the whole truth must be disclosed, (ii) when one makes a representation, new information that makes the earlier statement untrue must be disclosed, and (iii) when one makes a partial disclosure and conveys a false impression, the false impression must be corrected.  Stephens v. Friendly Chevrolet, Ltd., 2005 Tex. App. LEXIS 3170 (Tex. App.--Dallas, April 28, 2005, pet. denied); Columbia/HCA Healthcare Corp. v. Cottey, 72 S.W.3d 735, 744 (Tex. App.--Waco 2002, no pet.); Hoggett v. Brown, 971 S.W.2d 472, 487 (Tex. App.--Houston [14th Dist.] 1997, pet. denied).

140.  Bollinger and/or Micro-Waste did not fraudulently induce either Ventre or Group to enter into the License Agreement.  (*See* Findings of Fact Nos. 177-251.)

141.  The License Agreement is valid and of full force and effect.

V.   License as an Affirmative Defense to the Patent
     Infringement Claim

142.   A license, whether express or implied, is a defense to
patent infringement.   *See* Carborundum Co. v. Molten Metal Equip.
Innovations, 72 F.3d 872, 878 (Fed. Cir. 1995).   The alleged
infringer has the burden of establishing this affirmative defense.
Id.

143.   "Whether express or implied, a license is a contract
governed by ordinary principles of state contract law."   State
Contracting & Eng'g Corp. v. Florida, 258 F.3d 1329, 1339 (Fed.
Cir. 2001) (internal quotation marks and citations omitted).

144.   Because Bollinger was authorized and/or impliedly
licensed to submit Micro-Waste's March 3, 2003 bid to the HCHD,
Micro-Waste's bid did not infringe the '000 Patent.

145.   Because Micro-Waste had a valid express license to
manufacture, have manufactured, produce, alter, modify, use, market
and sell Sanitec MDUs, Micro-Waste's manufacture and sale of a
Sanitec MDU to the HCHD based on its June 3, 2003, bid, did not
infringe the '000 Patent.

VI.   Breach of the License Agreement Contract by Licensor
      Industries

146.   Upon entering into the License Agreement, Group promised
not to sue Micro-Waste for patent infringement for manufacturing,
having manufactured, producing, altering, modifying, using,

89

marketing, or selling Sanitec MDUs.  *See* <u>Gen-Probe Inc. v. Vysis, Inc.</u>, 359 F.3d 1376, 1381 (Fed. Cir. 2004) ("Upon entering into the [license] agreement, Vysis [the patentee] promised not to sue Gen-Probe [the licensee].  In other words, the license insulated Gen-Probe from an infringement suit instituted by Vysis.") (internal citations omitted); *see also* <u>MedImmune, Inc. v. Centocor</u>, Inc., 409 F.3d 1376, 1379 n.1 (Fed. Cir. 2005) ("[A] license is, by its nature, an agreement not to litigate.  A licensor agrees to receive royalties or other consideration from the licensee in exchange for a covenant not to sue or disturb the licensee's activities."); <u>Metabolite Labs., Inc., v. Lab. Corp. of Am. Holdings</u>, 370 F.3d 1354, 1369 (Fed. Cir. 2004) ("[A] license is, in essence, a licensor's covenant not to sue the licensee."); <u>Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.</u>, 248 F.3d 1333, 1345 (Fed. Cir. 2001) ("[A] nonexclusive license or 'bare' license [is] a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention"); <u>Gart v. Logitech, Inc.</u>, 254 F.3d 1334, 1346 (Fed. Cir. 2001) ("The whole point of offering a license is to insulate a licensee from infringement charges by the licensor."); <u>Ortho Pharm. Corp. v. Genetics Inst., Inc.</u>, 52 F.3d 1026, 1031 (Fed. Cir. 1995) ("In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent.  Such a license grants to the licensee merely a privilege that protects him from a claim of

infringement by the owner of the patent monopoly.") (quoting W. Elec. Co. v. Pacent Reproducer Corp., 42 F.2d 116, 118 2d Cir. (1930) (Hand, J.)); Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1081 (5th Cir. 1987) ("[A] patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee.").

147.   When Group in February, 2004, assigned to Industries the '000 Patent, the assignment was subject to the License Agreement with Micro-Waste, of which Industries had actual knowledge. (*See* Findings of Fact Nos. 254, 256, 257, 264-267.)

148.   A party "acquiring by assignment or license an interest in [an] invention . . . takes title [from the assignor] subject to prior assignments or licenses of which the assignee must inform himself as best he can and at his own risk . . . ." Am. Dirigold Corp. v. Dirigold Metals Corp., 125 F.2d 446, 452 (6th Cir. 1942). *See also* In re Novon Int'l, Inc., Nos. 98-CV-0677E(F), 96-BK-15463B, 2000 WL 432848, at *5 (W.D.N.Y. Mar. 31, 2000)(noting that the assignee of a patent "'takes subject to the legal consequences of the patentee's previous acts, and subject to the licenses previously granted by assignor'"(quoting WALKER ON PATENTS § 19:22)); Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc., 565 F. Supp. 931, 939 (D.C.N.J. 1983)("It is . . . a principle of patent law

. . . that the purchaser does not acquire any rights greater than those possessed by the owner of the patent.").

149.  Group's Agreements with Platinum Funding Corporation, Platinum's November 2003 assignment to Industries of all of its rights under the [Platinum] Factoring Agreement and Security Agreement, and Industries's subsequent foreclosure suit against Group in the Superior Court of New Jersey, which concluded with a Final Judgment in March, 2004, in which the court transferred and assigned to Industries "all of Defendant Group's right, title and interest" both in the '000 Patent and in the Micro-Waste License Agreement (see Findings of Fact Nos. 289-303), resulted in Industries being the uncontroverted assignee of the '000 Patent and the uncontroverted assignee of and successor to the Licensor's interest in the License Agreement with Micro-Waste.

150.  The License Agreement by the express terms of its Article 9.02 is "binding on and inure[s] to the benefit of the respective successors and assigns of the parties" thereto, and the License Agreement was therefore fully binding on Industries as Licensor at all times from and after March, 2004.

151.  By filing this suit on July 30, 2004, against Micro-Waste for alleged infringement of the '000 Patent, based on Micro-Waste engaging in activities that were expressly authorized by the License Agreement, Industries as a matter of law committed a material breach of the License Agreement.

152.  Industries's foregoing material breach of the License Agreement made it necessary for Micro-Waste to employ legal counsel, with corresponding expenses and court costs, to enforce the Agreement.

153.  Under Article 9.08 of the License Agreement, Industries is liable to Micro-Waste for reasonable attorney's fees, expenses, and court costs incurred by Micro-Waste in enforcing the License Agreement.

VII. <u>Conversion</u>

154.  "Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights." <u>Smith v. Maximum Racing, Inc</u>., 136 S.W.3d 337, 341 (Tex. App.--Austin 2004) (citing <u>Waisath v. Lack's Stores, Inc.</u>, 474 S.W.2d 444, 447 (Tex. 1971)).

155.  To establish a claim for conversion of personal property, a plaintiff must prove that: (i) the plaintiff owned or had legal possession of the property or entitlement to possession; (ii) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as owner; (iii) the plaintiff demanded return of the property; and (iv) the

defendant refused to return the property.  Smith, 136 S.W.3d at 341 (citations omitted).

156.  Texas law does not recognize a cause of action for conversion of intangible property except in those limited cases where the underlying intangible right has been merged into a document and there has been conversion of that document.  Neles-Jamesbury, Inc. v. Bill's Valves, 974 F. Supp. 979, 982 (S.D. Tex. 1997) (Atlas, J.); accord Express One Int'l, Inc. v. Steinbeck, 53 S.W.3d 895, 900-01 (Tex. App.--Dallas 2001).  Thus, plans and drawings can constitute tangible property subject to conversion. See Fed. Fir. Protection Corp. v. J.A. Jones/Tompkins Builders, Inc., 267 F. Supp. 2d 87, 92 (D.D.C. 2003) (recognizing conversion claim based on sprinkler system drawings); State Farm Fire & Cas. Ins. Co. v. White, 777 F. Supp. 952, 955 (N.D. Ga. 1991) ("[A]rchitectual plans, in the sense of their being printed on paper, meet the legal definition of tangible property" for purposes of a conversion claim.); Colton, McMichael, Lester, Auman, Visnovske, Inc. v. Mueller, 896 S.W.2d 741, 743 (Mo. App. 1995) ("While conversion does not lie for the appropriation of an idea or a debt, where intangible rights are merged in or identified with some document, conversion may be maintained.") (citing cases).

157.  Micro-Waste did not convert the ABB-S Drawings.

158.  Micro-Waste did not convert any of Industries's intellectual property.  (See Findings of Fact Nos. 168-256.)

VIII. <u>Lanham Act/Unfair Competition</u>

159.  The elements of a Lanham Act false advertising claim (15 U.S.C. § 1125(a)(1)(B) or a false designation of origin (also referred to as "passing off") claim (§ 1125(a)(1)(A)), are identical.  <u>Logan v. Burgers Ozark Country Cured Hams Inc.</u>, 263 F.3d 447, 462 (5th Cir. 2001); <u>Pizza Hut, Inc. v. Papa John's Int'l, Inc.</u>, 227 F.3d 489, 495 (5th Cir. 2000), *cert. denied*, 532 U.S. 920 (2001).

160.  To prevail on a Lanham Act claim, a plaintiff generally must prove: (i) that the defendant made a false or misleading statement of fact about a product; (ii) that the statement actually deceived or tended to deceive its intended audience; (iii) that the deception was material, in that it tended to influence purchasing decisions; (iv) that the defendant caused the false statement to enter interstate commerce; and (v) that there is likelihood of injury to the plaintiff in terms of declining sales, loss of goodwill, etc.  *See* <u>King v. Ames</u>, 179 F.3d 370, 373-74 (5th Cir. 1999); <u>Seven-Up Co. v. Coca-Cola Co.</u>, 86 F.3d 1379, 1383 n.3 (5th Cir. 1996).

161.  The likelihood of confusion is an essential element in a Lanham Act claim.  <u>King</u>, 179 F.3d at 374; <u>Batiste v. Island Records, Inc.</u>, 179 F.3d 217, 225 (5th Cir. 1999), *cert. denied*, 528 U.S. 1076 (2002).

162.   For a Lanham Act § 43(a) claim, a plaintiff must prove that there is a likelihood of injury to the plaintiff.  <u>Air Turbine Tech., Inc. v. Atlas Copco AB</u>, 410 F.3d 701, 709 (Fed. Cir. 2005); <u>Enzo Life Sciences, Inc. v. Digene Corp.</u>, 295 F. Supp.2d 424, 427 (D. Del. 2003); <u>Johnson & Johnson-Merck Consumer Pharms Co. v. Rhone-Poulenc Rorer Pharms., Inc.</u>, 19 F.3d 125, 129 (3d Cir. 1994).

163.   Micro-Waste did not violate § 43 of the Lanham Act. (*See* Findings of Fact Nos. 202-207, 228, 229, 237-241.)

164.   "Unfair competition under Texas law 'is the umbrella for all statutory and non-statutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'" <u>Taylor Publ'g Co. v. Jostens, Inc.</u>, 216 F.3d 465, 486 (5th Cir. 2000) (quoting <u>Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.</u>, 494 F.2d 3, 14 (5th Cir. 1974)).

165.   "The tort [of unfair competition] requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business." <u>Id.</u>

166.   The illegal act upon which the unfair competition claim is based "must at least be an independent tort." <u>Id.</u> (citing <u>Schoellkopf v. Pledger</u>, 778 S.W.2d 897, 904-05 (Tex. App.--Dallas 1989, writ denied)).

167.   Where the illegal act alleged is a violation of the Lanham Act, that violation must be proven to sustain the claim of unfair competition. *See* <u>Decorative Ctr. of Houston, L.P. v. Direct</u>

Response Publ'ns, Inc., 264 F. Supp. 2d 535, 557 (S.D. Tex. 2003) (Atlas, J.) (dismissing on summary judgment an unfair competition claim because the Lanham Act claim "underpinning" such claim was dismissed).

168.  Micro-Waste committed no illegal act that would sustain Industries's claim of unfair competition.

169.  Micro-Waste did not engage in unfair competition. (*See* Findings of Fact Nos. 202-207, 228, 229, 237-241.)

170.  **If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.**

<u>CONCLUSION AND ORDER</u>

Based upon the foregoing Findings of Fact and Conclusions of Law, and the separate Memorandum and Order signed June 2, 2006, the Court will enter a Final Judgment that Plaintiff Sanitec Industries, Inc. take nothing against Defendant Micro-Waste Corporation, and dismissing on the merits its complaint and cause of action; that Defendant/Counter-Claimant Micro-Waste Corporation have and recover of and from Plaintiff/Counter-Defendant Sanitec Industries, Inc. its damages incurred by reason of Industries's breach of the valid and enforceable License Agreement pertaining to

97

Industries's '000 Patent, which damages consist of attorney's fees, expenses, and court costs incurred in these proceedings to enforce the License Agreement, and Defendant/Counter-Claimant Micro-Waste shall take nothing on its other counterclaims, which shall be dismissed on the merits.

The attorney's fees, expenses, and costs to which Micro-Waste is entitled shall be those incurred in successfully enforcing the License Agreement and its validity, and defending Micro-Waste's conduct under the License Agreement, and shall not include attorney's fees, expenses, and costs incurred in its prosecution of unsuccessful claims and defenses and, in particular, its defenses that the '000 Patent is invalid or unenforceable and its previously dismissed tortious interference and Lanham Act claims against Industries.  The Court requests the parties to reach agreement in accordance with the foregoing holding on the amount of attorney's fees, expenses, and costs that will be awarded to Micro-Waste in the Final Judgment.

To establish a schedule, it is

ORDERED that within fourteen (14) days after the entry of these Findings of Fact, Conclusions of Law, and Conclusion and Order, the parties shall in good faith undertake to reach a complete agreement on the amount of attorney's fees, expenses, and costs to be awarded to Micro-Waste in accordance with the above holding.  In this connection, Micro-Waste shall make appropriate

98

disclosure to Industries, if requested, of its proof for the attorney's fees, expenses, and costs claimed, including supporting material and records (redacting only matters that may justifiably be withheld as attorney-client privileged), within ten (10) days after the entry of this Order.  Upon reaching agreement, the parties shall promptly advise the Court of the amount of attorney's fees, expenses, and costs that were reasonably incurred in connection with Micro-Waste's successful enforcement of the License Agreement in defending the claims brought against it by Industries. Industries's agreement to the *amount* of attorney's fees, expenses, and costs shall be without prejudice to Industries appealing from the Final Judgment on the basis that no award of such fees, expenses, and costs should have been adjudged in favor of Micro-Waste.

If the parties do not reach agreement on the foregoing amount, the parties shall file with the Court a Joint Status Report twenty-one (21) days after the entry of this Order, signed by lead counsel for both sides, in which they state the final results of their failed negotiations by stating to the Court the smallest sum for attorney's fees, expenses, and costs that Micro-Waste agreed to accept, and the largest sum for these items to which Industries would agree.  Within seven (7) days after filing the Joint Status Report required above, Micro-Waste may file its affidavit and supporting materials with the Court, serving a copy upon

Industries's counsel and, within seven (7) days after Industries's counsel is served with Micro-Waste's filing, Industries may file its controverting affidavit and supporting materials.  Within seven (7) days after being served with Industries's controverting affidavit and materials, Micro-Waste may file a reply not to exceed ten pages if it believes that a reply is necessary.  No other filings shall be permitted except by specific leave of court for good cause shown.

The Clerk shall notify all parties and provide them with a true copy of these Findings of Fact, Conclusions of Law, and Conclusion and Order.

SIGNED at Houston, Texas, on this 28th day of November, 2006.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE